1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   OSHAY L. JOHNSON,

11            Plaintiff,                    No. 2:08-cv-1494 KJN P

12      vs.

13   CARROLL, et al.,                       ORDER and

14            Defendants.                    FINDINGS AND RECOMMENDATIONS[1]

15   _____/

16   I. Introduction

17            Plaintiff is a state prisoner, incarcerated at the California Medical Facility

18   ("CMF"), in Vacaville, California,[2] under the authority of the California Department of

19   Corrections and Rehabilitation ("CDCR").  Plaintiff proceeds in this civil rights action, filed

20   pursuant to 42 U.S.C. § 1983, with court-appointed counsel.  On May 10, 2012, the undersigned

21   heard defendants' oral argument in support of their motion for summary judgment, and plaintiff's

22   opposition thereto.  Attorney R. Shanti Brien appeared on behalf of plaintiff; Matthew Ross

23

24         [1]  This matter is before the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), Local
     General Order No. 262, and Local Rule 302(c).

25
           [2]  See Plaintiff's Notice of Change of Address filed Sept. 29, 2009; see also CDCR's
26   "Inmate Locator" website, at http://inmatelocator.cdcr.ca.gov/.

                                             1

1   Wilson appeared on behalf of defendants.

2          For the reasons that follow, the court recommends that defendants' motion for

3   summary judgment be granted in part, and denied in part, and that this action proceed against

4   defendants Carroll and Sisto on plaintiff's First Amendment Free Exercise and Fourteenth

5   Amendment Equal Protection claims; and against defendants J. Johnson, Fowler, Jackura, San

6   Nicholas and Kesterson on plaintiff's First Amendment retaliation and conspiracy claims.  The

7   court recommends that defendants' motion for summary judgment should be granted on

8   plaintiff's Eighth Amendment sexual harassment claim against defendant J. Johnson; on

9   plaintiff's Eighth Amendment excessive force claim against defendant Fowler; and on plaintiff's

10  First Amendment retaliation and conspiracy claims against defendants Cervantes and Sisto.

11  II.  Background

12         This action proceeds on plaintiff's Amended Complaint ("AC" or "complaint"),

13  filed April 6, 2009.  (Dkt. No. 14.)  Pursuant to initial screening under 28 U.S.C. § 1915A, the

14  court found that the complaint stated potentially cognizable claims against eight named

15  defendants, but not against five other named defendants.  The court granted plaintiff leave to file

16  a further amended complaint in an effort to state cognizable claims against all of the named

17  defendants, or to proceed on his Amended Complaint against the eight identified defendants

18  while consenting to dismissal of the remaining five defendants.  (Dkt. No. 17.)  Plaintiff chose to

19  proceed on his Amended Complaint, thus agreeing to the dismissal of defendants Medinna,

20  Abella, Fernandez, Ramirez and Fry.  (Dkt. Nos. 18, 19.)

21         Thereafter, the remaining defendants -- Carroll, Sisto, Cervantes, J. Johnson,

22  Fowler, Jackura, San Nicholas and Kesterson -- chose not to file a motion to dismiss, but instead

23  filed an answer to the complaint.  (Dkt. No. 21.)  After setting a discovery and motion schedule

24  in the case (Dkt. No. 24), subsequently extended pursuant to approval of the parties' stipulations

25  (Dkt. Nos. 29-31), the undersigned, on March 2, 2011, granted plaintiff's motion for appointment

26  of counsel (Dkt. Nos. 25, 26).  After the close of discovery, defendants timely filed the instant

1   motion for summary judgment (Dkt. No. 33); plaintiff timely filed an opposition (Dkt. No. 39);

2   defendants filed a reply (Dkt. No. 40).[3]

3           The complaint challenges three relatively distinct series of events that allegedly

4   occurred on or about January 14, 2007, February 11, 2007, and April 26, 2007.  Given these

5   disparate dates, and the number of defendants, the court initially summarizes plaintiff's factual

6   allegations and legal claims.

7           Plaintiff states that he is a Muslim who does not eat meat for religious reasons.

8   The complaint alleges that, on January 14, 2007, shortly after plaintiff was transferred to

9   California State Prison-Solano ("CSP-SOL"), Correctional Officer ("CO") Carroll confiscated

10  plaintiff's Religious Diet Card previously issued by Old Folsom State Prison, and that such

11  confiscation was motivated by discrimination against plaintiff's religion.  Plaintiff alleges that

12  defendant Sisto, CSP-SOL Warden, ratified Carroll's allegedly discriminatory conduct and, as a

13  result, plaintiff never received a CSP-SOL Religious Diet Card or obtained religious meals while

14  incarcerated at CSP-SOL.  Plaintiff alleges that he suffered weight loss, stress, and difficulty

15  sleeping, despite initially attempting to supplement his diet with acceptable food that he

16  purchased from the canteen.  On screening, the court found that these allegations stated

17  potentially cognizable claims against defendants Carroll and Sisto, under the First Amendment's

18  Free Exercise Clause, and the Fourteenth Amendment's Equal Protection Clause.

19          Next, the complaint alleges that, on February 11, 2007, defendant CO J. Johnson[4]

20  allegedly became sexually aroused when he strip-searched plaintiff.  Plaintiff alleges that when

21  he "made a comment," J. Johnson cuffed plaintiff and took him to "center complex" where, in

22  front of five other officers -- including defendant Sergeant Fowler -- J. Johnson challenged

23  _____

24    [3]  Additionally, after the hearing, plaintiff's counsel filed a brief "Statement of
    Correction," in which she conceded a mistatement of fact at the hearing, and asked the court to
25  abide by the pertinent undisputed fact.  (Dkt. No. 42.)

26    [4]  The court refers to this defendant as "J. Johnson," to distinguish him from plaintiff "O.
    Johnson."

1   plaintiff to a fight and sought to provoke him, without resulting in any fight.  The complaint

2   alleges that defendant Fowler then directed CO Ramirez (not a defendant) to trash and take

3   plaintiff's property, and directed J. Johnson to step out, then Fowler "got in plaintiff's face,

4   called him many disrespectful names . . .[,] physically bumped plaintiff, and he spit in plaintiff's

5   face to provoke him . . . then told plaintiff that he would make sure he goes to the hole (ad-seg),

6   steal his property, and he guaranteed a parole denial."  (AC at 4, Exh. B.)  Once again, this

7   alleged interaction did not result in a fight.  Plaintiff states that he pursued an administrative

8   grievance against J. Johnson and the others, but that defendant Cervantes, CSP-SOL Appeals

9   Coordinator, allegedly acting in retaliation, failed to properly process the grievance.  The court

10  found that these alleged facts stated potentially cognizable Eighth Amendment claims against

11  defendants J. Johnson and Fowler, and a potential First Amendment retaliation claim against

12  defendant Cervantes.  (AC at 5.)

13          Next, the complaint challenges plaintiff's placement in administrative segregation

14  ("Ad Seg') on April 26, 2007, and his retention there during the next 17 months.  The official

15  rationale was premised on CO Jackura's purported discovery, on April 26, 2007, that plaintiff,

16  when previously housed at CSP-SOL ten years before, assaulted CO San Nicholas; and that San

17  Nicholas, upon learning of plaintiff's renewed presence at CSP-SOL, expressed concerns for his

18  safety, and requested that plaintiff be moved to Ad Seg pending plaintiff's transfer to another

19  institution.  The court found that these allegations stated potentially cognizable First Amendment

20  retaliation claims against defendants J. Johnson, Fowler, Cervantes, Jackura, San Nicolas, and

21  Kesterson, based on plaintiff's allegations that these defendants conspired to place plaintiff in Ad

22  Seg in retaliation for plaintiff's filing of the administrative grievance against J. Johnson.

23          The remainder of plaintiff's allegations concerning the hardships he endured

24  while in Ad Seg are not before the court because they were not administratively exhausted or

25  sound in habeas rather than civil rights, but these allegations include:  plaintiff was denied a

26  family visit when his father died; that he was allegedly "consistently harassed," including being

4

1  convicted of three allegedly false rules violations instigated by defendants; that these findings

2  impaired his parole eligibility; and that plaintiff "lost weight, and was suffering as if being

3  tortured, and suffered from depression, and had to see the psychiatrist." (AC at 6-8.)

4        Defendants move for summary judgment and/or a finding of qualified immunity

5  on each of plaintiff's claims against each defendant.

6  III.  Legal Standards for Summary Judgment

7        Summary judgment, in whole or in part (summary adjudication of issues), is

8  appropriate when it is demonstrated that the standard set forth in Federal Rule of Civil Procedure

9  56(c) is met.  "The judgment sought should be rendered  if . . . there is no genuine issue as to any

10  material fact, and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

11  56(c).

12          Under summary judgment practice, the moving party always bears
            the initial responsibility of informing the district court of the basis
13          for its motion, and identifying those portions of "the pleadings,
            depositions, answers to interrogatories, and admissions on file,
14          together with the affidavits, if any," which it believes demonstrate
            the absence of a genuine issue of material fact.
15

16  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), quoting Federal Rule of Civil Procedure

17  56(c).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,

18  a summary judgment motion may properly be made in reliance solely on the 'pleadings,

19  depositions, answers to interrogatories, and admissions on file.'"  Id.  Summary judgment should

20  be entered, after adequate time for discovery and upon motion, against a party who fails to make

21  a showing sufficient to establish the existence of an element essential to that party's case, and on

22  which that party will bear the burden of proof at trial.  Id. at 322.  "[A] complete failure of proof

23  concerning an essential element of the nonmoving party's case necessarily renders all other facts

24  immaterial."  Id. at 323.  In such a circumstance, summary judgment should be granted, "so long

25  as whatever is before the district court demonstrates that the standard for entry of summary

26  judgment, as set forth in Rule 56(c), is satisfied."  Id.

1          If the moving party meets its initial responsibility, the burden then shifts to the

2    opposing party to establish that a genuine issue as to any material fact actually exists.  See

3    Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting

4    to establish the existence of a factual dispute, the opposing party may not rely upon the

5    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

6    form of affidavits, and/or admissible discovery material, in support of its contention that a

7    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586, n.11.  The opposing party

8    must demonstrate that the disputed fact is material, i.e., a fact that might affect the outcome of

9    the suit under governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

10   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and

11   that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

12   for the nonmoving party, see Anderson, 477 U.S. at 248; T.W. Elec. Serv., 809 F.2d at 631.

13         In the endeavor to establish the existence of such a factual dispute, the opposing

14   party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

15   claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

16   versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary

17   judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

18   genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e), Advisory

19   Committee's note on 1963 amendments).

20         In resolving a summary judgment motion, the court examines the pleadings,

21   depositions, answers to interrogatories, and admissions on file, together with any affidavits.  Fed.

22   R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  Anderson, 477 U.S. at

23   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

24   drawn in favor of the opposing party.  Matsushita, 475 U.S. at 587.  Nevertheless, inferences are

25   not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

26   from which the inference reasonably may be drawn.  Richards v. Nielsen Freight Lines, 602 F.

1    Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

2    demonstrate a genuine issue, the opposing party "must do more than simply show that there is

3    some metaphysical doubt as to the material facts . . .  Where the record taken as a whole could

4    not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

5    trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

6              On December 6, 2002, the court advised plaintiff of the requirements for opposing

7    a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. No. 20.)  See Rand

8    v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and

9    Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

10   IV.  Qualified Immunity

11             Defendants conclude their motion for summary judgment by asserting that each

12   defendant is entitled to qualified immunity on each of plaintiff's claims.

13             "Qualified immunity balances two important interests -- the need to hold public

14   officials accountable when they exercise power irresponsibly and the need to shield officials from

15   harassment, distraction, and liability when they perform their duties reasonably."  Pearson v.

16   Callahan, 555 U.S. 223, 231 (2009).  The objective of the qualified immunity doctrine is to

17   ensure "that 'insubstantial claims' against government officials be resolved prior to discovery

18   and on summary judgment if possible."  Anderson v. Creighton, 483 U.S. 635, 640 n.23 (1987),

19   citing Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).  Meeting this objective requires that

20   immunity questions be resolved "at the earliest possible stage in litigation."  Hunter v. Bryant,

21   502 U.S. 224, 227 (1991) (per curiam).

22             "'Qualified immunity shields federal and state officials from money damages

23   unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional

24   right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'"

25   Hunt v. County of Orange, 2012 WL 432297 at *7 (9th Cir., Feb. 13, 2012) (quoting Ashcroft v.

26   al-Kidd, 131 S. Ct. 2074, 2080 (2011)).  "A Government official's conduct violates clearly

1   established law when, at the time of the challenged conduct, 'the contours of a right are

2   sufficiently clear' that every 'reasonable official would have understood that what he is doing

3   violates that right.'" Anderson, 483 U.S. at 640 (internal alterations omitted).

4           Although the court was once required to answer these questions in order, the

5   Supreme Court has clarified that "while the sequence set forth there is often appropriate, it

6   should no longer be regarded as mandatory." Pearson, 555 U.S. at 236.  In this regard, if a court

7   decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there

8   is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S.

9   194, 201 (2001).  Likewise, if a court determines that the right at issue was not clearly

10  established at the time of the defendant's alleged misconduct, the court may end further inquiries

11  concerning qualified immunity without determining whether the allegations in fact make out a

12  statutory or constitutional violation.  Pearson, 555 U.S. at 236–42.

13          In resolving the question of qualified immunity, the court views the facts in the

14  light most favorable to the plaintiff.  See Schwenk v. Hartford, 204 F.3d 1187, 1198 (9th Cir.

15  2009).

16  V.  Undisputed and Disputed Facts

17          The following facts are either undisputed by the parties or, following the court's

18  review of the evidence, are deemed undisputed for purposes of the pending motion.  Disputed

19  facts are also noted.

20          1.  CDCR's "Religious Diet Program" is governed by regulations that require an

21  inmate to submit the appropriate application (a CDCR Form 3030 ("Religious Diet Request")) to

22  his institutional chaplain, and obtain written approval thereof; approved applications are to

23  implemented within 30 days after receipt by the chaplain.[5]

24  _____

25          [5]  Cal. Code Regs., tit. 15, § 3054.4, provides in pertinent part:

26      3054.4.  Participation in a Religious Diet Program

8

2.  Plaintiff, who was born in 1972, has been incarcerated under the authority of CDCR since 1993.  After three years incarceration at Pelican Bay State Prison, plaintiff was transferred to CSP-SOL on August 27, 1996, and remained there until January 14, 1998, when he was transferred to CSP-Sacramento, and then to Old Folsom State Prison.  Plaintiff remained at Old Folsom State Prison until July 17, 2006, when he was transferred to the California Correctional Center in Susanville, California.  Plaintiff was returned to CSP-SOL on January 9, 2007, and remained there until September 10, 2008, when he was transferred to Pleasant Valley State Prison.  Plaintiff was transferred to CMF on September 24, 2009.  (See Dkt. No. 33-6 at 5-8.)

3.  Consistent with his Islamic religious beliefs, plaintiff has not eaten pork since he was seventeen years old, or red meat since September 1992.  After his incarceration, plaintiff continued to be a vegetarian in observance of his sincerely-held religious beliefs.  From 1992 until 2004, plaintiff observed his religious-based diet by communicating his requests for a vegetarian ("no meat" or "meat substitute") diet[6] directly to the inmate serving meals on the serving line.

4.  Plaintiff first obtained a Religious Diet Card in 2004, when he was housed at Old Folsom State Prison; he received the card approximately one week after submitting his request.  When plaintiff was transferred in 2006 to the California Correctional Center ("CCC"),[7]

---

(a)   Any inmate who claims to require a religious diet shall be responsible for completing a CDCR Form 3030, Religious Diet Request, and submitting it to the appropriate institution's Chaplain.  No more than 30 calendar days shall pass from the day the Chaplain receives the completed CDCR Form 3030, Religious Diet Request, which results in a determination of program eligibility, to the day an accepted inmate begins receiving the religious meals requested. . . .

[6]  As noted infra, in February 2010, CDCR implemented a "Religious Meat Alternate Program," which provides halal meat to Muslim (and Jewish) inmates.  See 15 C.C.R. § 3054.3.

[7]  Plaintiff generally refers to CCC as "High Desert State Prison," apparently because the institutions are adjacent in Susanville, California.

9

1 the officials there allowed plaintiff to use his Old Folsom Religious Diet Card, thus allowing

2 plaintiff to observe his dietary restrictions and receive the vegetarian/meat substitute option.

3        5.  When plaintiff was transferred to CSP-SOL on January 9, 2007, his property

4 was searched, but he was permitted to keep his Old Folsom Religious Diet Card.  Using that

5 card, plaintiff was able to obtain meat-substitute meals at CSP-SOL until January 14, 2007, when

6 the card was allegedly confiscated by defendant Carroll.

7        6.  Plaintiff never received a Religious Diet Card from CSP-SOL, and never

8 obtained religious meals while incarcerated at CSP-SOL, despite allegedly submitting a

9 Religious Diet Request to the chaplain within a day or two after plaintiff's January 2007 transfer

10 to CSP-SOL.

11        a.  There is currently no evidence of record to support plaintiff's averment

12 that he submitted an application to obtain a CSP-SOL Religious Diet Card; however, defendants

13 do not identify this matter as a disputed fact and concede, both in their briefing and at the

14 hearing, for purposes of the instant motion only, that plaintiff submitted a Religious Diet Request

15 to the CSP-SOL chaplain shortly after plaintiff's transfer to CSP-SOL.

16        b.  Plaintiff avers, under penalty of perjury, that within a day or two after

17 his transfer to CSP-SOL, he completed a Religious Diet Request and submitted it to the CSP-

18 SOL Imam.  Plaintiff further avers that the Imam then informed him that, while the process

19 normally takes thirty days, there was a four-month back log at CSP-SOL, and instructed plaintiff

20 to continue to use his Old Folsom Religious Diet Card.  (Pltf. Depo. 26:16-27:10; Pltf. Decl. ¶

21 6.)

22        c.  Plaintiff further avers that, when he did not receive a CSP-SOL

23 Religious Diet Card pursuant to his request, he filed an administrative appeal to obtain one, but

24 never received a response; that defendant Cervantes was the Inmate Appeals Coordinator at the

25 ////

26 ////

1    time.[8]  (Pltf. Depo. 27:11 - 28:16.)

2          7.  Plaintiff alleges in his sworn declaration and deposition testimony that, on

3    January 14, 2007, defendant CO Carroll confiscated plaintiff's Old Folsom Religious Diet Card.

4          a.  Plaintiff avers that on January 14, 2007, defendant Carroll requested to

5    see plaintiff's meal card while he was in line to receive a meat-substitute meal tray; that Carroll

6    told plaintiff he couldn't use his Old Folsom card; that plaintiff responded there was a backlog in

7    getting CSP-SOL meal cards, and that a CSP-SOL sergeant had told him he could use the Old

8    Folsom Religious Diet Card.

9          b.  Plaintiff further avers that, after dinner on January 14, 2007, while

10   plaintiff was crossing the yard with another inmate (Willie Pace), defendant Carroll crossed the

11   yard, cut plaintiff off and told plaintiff to surrender his Old Folsom Religious Diet Card.

12   Plaintiff alleges that Carroll stated that he knew Muslims ate meat, and that plaintiff could "take

13   the meat off the tray" or "just don't eat," or "eat it, because all you Muslims be faking it

14   anyway."  (Pltf. Decl. at 2, ¶ 8; Pltf. Depo. 24:15-25:20.)  Plaintiff avers that "[t]he conversation

15   went back and forth for about five minutes, [and] officer Carrol (sic) got more disrespectful

16   making several bias comments toward Muslims."  (Pltf. Decl. at 2, ¶ 8.)  Plaintiff states that he

17   asked to speak with a sergeant, but Carroll refused, and confiscated plaintiff's Old Folsom

18   Religious Diet Card.

19          c.  Plaintiff further avers that inmate Willie Pace was present throughout

20   plaintiff's interaction with defendant Carroll.  (Id.)  Mr. Pace has filed a sworn declaration that

21

22

23          [8]  It is unclear whether this administrative appeal is the same appeal referenced in
     plaintiff's declaration, wherein he avers that he submitted an administrative appeal on March 13,
     2007 (Log No. CSP-S-07-00737), but withdrew the appeal on April 5, 2007, pursuant to the
24   representation of Lt. Parks (when interviewing plaintiff pursuant to his grievance challenging the
     conduct of defendant Carroll (Log No. CSP-S-07-00273)), that "the machine was broke and that I
25   was on the list to get my card . . . . [T]hus, I withdr[e]w this complaint . . . with an expectation
     that I would get my no-meat card within days.  [¶ ]  I never got the card and went to
26   administrative segregation on April 26, 2007."  (Pltf. Decl. ¶¶ 10-12.)

1   provides in pertinent part (Dkt. No. 39-11):[9]

2         On January 14, 2007, just after dinner, I was walking across the
3   yard with [plaintiff]. Correctional officer Carrol (sic) cut across
    the yard and stopped [plaintiff] and asked him for his meal card.
    Officer Carrol (sic) told [plaintiff] to "take the meat off the tray" or
4   "just don't eat." Additionally Officer Carrol made several
    derogatory comments about Muslims, saying that "all you Muslims
5   be faking it anyway," and "other Muslims eat meat." He also said,
    "You freakin people aint noby (sic) special, most of you are full of
6   shit. And if it were up to me you would have to eat pork and
    whatever just like everybody else." At the end of the interaction,
7   Officer Carrol (sic) took [plaintiff's] meal card from him.

8         8.  Defendant Carroll avers, in his sworn answers to interrogatories, that he has no

9   recollection of asking plaintiff to see his dietary card on January 14, 2007, and no recollection of

10  confiscating plaintiff's Old Folsom Religious Diet Card; moreover, defendant Carroll has no

11  recollection of any interaction with plaintiff on or about January 14, 2007.

12        9.  Plaintiff avers that he is opposed to receiving meal trays that contain meat, and

13  then removing the meat, because he believes that even the temporary presence of meat

14  contaminates the rest of his food, and thus violates plaintiff's religious beliefs and practices.

15  Because of this belief, after January 14, 2007, plaintiff purchased meals from the canteen rather

16  than receive meat trays; however, he had limited funds for such purchases. On April 26, 2007,

17  plaintiff was moved to Ad Seg, where he received regular meals without meat ever being placed

18  on his tray, but without a meat substitute. Plaintiff avers that he lost weight (he went from 170 to

19  157 pounds), felt stressed and had difficulty sleeping.

20        10.  Plaintiff states that, on two occasions between January 14, 2007, and April

21  26, 2007, he attempted to obtain a meat-substitute meal by waiting in the line designated for

22  Religious Diet Card holders, but was turned away; there were approximately 15 or 20 other

23  inmates in line for religious meals. Plaintiff's Old Folsom Religious Diet Card did not include a

24  picture of plaintiff, while the CSP-SOL-issued Religious Diet Cards did include inmate pictures.

25  _____

26     [9]  Citations to the record reflect the court's electronic pagination, not the internal
    pagination of the parties' pleadings.

1    Plaintiff testified that, in his 19 years in prison, he knew of no inmate forging a document to

2    obtain a special diet.

3              11.  Plaintiff avers, supported by the record, that he filed and exhausted an

4    administrative appeal challenging defendant Carroll's alleged confiscation of plaintiff's Old

5    Folsom Religious Diet Card, and defendant Carroll's allegedly discriminatory statements to

6    plaintiff, wherein plaintiff alleged violations of his First, Eighth and Fourteenth Amendment

7    rights.  (Log No. CSP-S-07-00273; see Dkt. No. 39-7 at 3-10.)

8              a.  The alleged facts set forth in plaintiff's administrative grievance

9    include the further allegations that Carroll "actually interfered with another officer who had the

10   card and was dealing with the situation;" that Carroll "walked up-on (sic) the conversation, asked

11   to see the card, then took over the conversation and situation displaying a discriminatory

12   disposition toward Islam thereforth (sic) his actions [were] capricious and vindictive and [were]

13   done for no other purpose but to impinge upon appellant's practise (sic) of his religion and

14   spiritual belief."  (Dkt. No. 39-7 at 5.)  Pursuant to this administrative grievance, plaintiff sought

15   the freedom to practice his religious belief that he should eat no meat, while still obtaining the

16   daily amount of calories recommended by federal nutritional standards; that plaintiff be given a

17   pass permitting him to obtain meat-substitute trays pending receipt of his new Religious Diet

18   Card; that plaintiff be provided with a copy of the rule allegedly supporting Carroll's confiscation

19   of plaintiff's Old Folsom Religious Diet Card; that the appeal be construed as a citizen's

20   complaint against Carroll; and that there be no retaliation or reprisal against plaintiff for filing the

21   grievance.  (Id. at 3, 5.)

22             b.  This appeal was partially granted at the First and Second Level

23   Reviews.  Pursuant to the First Level Review, plaintiff was interviewed by Correctional Lt.

24   Parks, who reportedly provided plaintiff with a CDCR 3030 Religious Diet Request form and

25   explained the process for submitting the application.  Plaintiff was informed that his card was

26   confiscated because "there is no standard card used by the Department . . . and therefore staff are

not able to verify the validity of each card that [is] issued from other institutions . . . ." (Dkt. No.

39-7 at 6.)  At the Second Level Review, issued on March 8, 2007, by defendant Sisto, plaintiff

was again informed of the procedure for obtaining a Religious Diet Card, and informed that

"Some Muslims eat meat.  If you have not received your dietary card, you can eat the meal that is

issued to you and eliminate the meat;" and ruled that the appeal would not be logged as a

citizens' complaint because "it was properly characterized as [a] religious program issue . . . . "

(Id. at 8.)

                c.  At the Director's Level Review, issued on July 2, 2007, CSP-SOL

Appeals Coordinator Grannis denied the appeal on the following grounds (id. at 9 (brackets in

original)):

> The information presented supports the contention that the
> appellant is being provided an avenue to receive an
> accommodation in support of his dietary requirements.  The
> appellant has not provided any evidence to demonstrate the he has
> followed directions and asked for a "no meat" dietary card at SOL
> by submitting the aforementioned request [CDCR Form 3030].
> The appellant is not required to abandon the practice of his faith as
> he asserts, he is just being directed to follow the established
> protocol.  The genuiness (sic) of the appellant's complaint is
> questioned, as it does not appear that the appellant has made any
> attempt whatsoever to legitimately obtain a "no meat" dietary card
> at SOL.  Once again, the appellant is directed to complete a CDCR
> Form 3030, Religious Diet Request form[,] and turn it into the
> chaplain who will provide the appellant the accommodation he
> seeks if he finds sincere belief in the faith that does not eat meat.
> [The appeals examiner has submitted an internal request for the
> Department to consider allowing a religious determination made at
> one institution to be accepted at subsequent institutions absent a
> contraindication; however, this does not excuse the appellant from
> following the directions disseminated to him at this time.]

            12.  In answers to interrogatories, defendant Warden Sisto made the following

sworn statements:

                a.  During the relevant period, an inmate at CSP-SOL "would generally not

have been able to use a religious diet card issued at a different institution because the [CDCR]

did not have a standard religious diet card.  It was impractical to verify the authenticity of a card

1   issued at a different institution and there were frequent attempts by inmates to forge and

2   otherwise tamper with religious diet cards." (Sisto's Answ. to Amd. Interr. No. 2.)

3               b. During the relevant period, "it was the standard practice to confiscate

4   an inmate's religious diet card issued at another institution when he arrived at [CSP-SOL].  The

5   purpose for this was that there was no standard card issued by every institution.  It was therefore

6   impossible to confirm the authenticity of a religious diet card issued at another institution.

7   Inmates without a genuine need for a religious diet may attempt to forge or otherwise tamper

8   with religious diet cards from other institutions."  (Sisto's Answ. to Amd. Interr. No. 3.)

9               c. During the relevant period, "inmates arriving [at CSP-SOL] from other

10  institutions were not issued temporary cards concerning religious diets. . . . The department

11  policies did not provide for the provision of temporary cards while the inmate completed the

12  process for obtaining a religious diet card. (Sisto's Answ. to Amd. Interr. No. 4.)

13              13.  Sergeant Fowler, a defendant in this action based on other allegations, made

14  the following pertinent statements in his October 27, 2011 deposition testimony.  (See Dkt. No.

15  33-5 at 71-78; Dkt. No. 39-9 at 1-10.)

16              a. Defendant Fowler testified that Religious Diet Cards were confiscated

17  at CSP-SOL only if they were forged; he was not aware of any cards being confiscated because

18  issued by another CDCR facility.  In response to questioning by plaintiff's counsel, Fowler

19  testified (Fowler Depo. 17:5-18):

20          Q.  Do you know if inmates use cards from other facilities other at CSP Solano?
            A.  I suppose a card can follow them from one facility to the next if they get a bed
21              move, sure.
            Q.  And if you were made aware that an inmate had been using a card from
22              another facility, what would you do?
            A.  If it's a valid card, they would continue to use it.  It doesn't change just
23              because they go from one facility to the next.  It's a prison program.
            Q.  So you're not aware of anyone having a meal card being confiscated because it
24              was issued at another facility?
            A.  No.  I would never do that, and I don't know if anybody has.  If they're
25              confiscated, it's because it's a forgery.

26  ////

b.   Defendant Fowler testified that the use of forged Religious Diet Cards is "[v]ery common," but that Fowler had confiscated only five or six cards in his ten years working for CDCR, and estimated that the last time he or another officer confiscated a forged diet card was five years before.  (Fowler Depo. 17:19-24; 18:17-23.)

c.   Defendant Fowler testified that "[t]he chaplain and the supervising cook" are in charge of the Religious Diet Card program; that the officer and cook assess the validity of cards; and that, if a card wasn't valid, "the officer who supervises the steam line and/or the cook would just confiscate it."  (Id. at 17:10-24.)

d.   Defendant Fowler testified that there is no training for correctional officers relative to the Religious Diet Card program; the only training is for "[t]he inmates that participate in the program and the cooks and the chaplains that give it . . . ."  (Id. at 17:2-4; see also 15:24-16:1; 16:25-17:1.)

e.   Defendant Fowler testified that he never heard a correctional officer say, or discerned a sentiment among officers that, Religious Diet Cards "are just a way for inmates to get this better food[.]"  (Id. at 18:10-16.)

14.   After his transfer to Pleasant Valley State Prison ("PVSP"), on September 10, 2008, plaintiff received a Religious Diet Card within an undisclosed period of time.  Plaintiff testified at his deposition, on August 30, 2011, that his PVSP Religious Diet Card was thereafter honored at CMF, where plaintiff was transferred on September 24, 2009, and continues to be honored at CMF.

15.   Defendant J. Johnson is a correctional officer at CSP-SOL, who has been employed with CDCR since 2006.  On February 11, 2007, in the "strip-out" room adjacent to the visiting room, J. Johnson conducted an unclothed body search of plaintiff.  No other inmates were present during J. Johnson's search of plaintiff, but one other staff member was present, identified by plaintiff as Office Price.  (Pltf. Depo. 39:3, 12.)

////

16. Under departmental policy, inmates leaving the prison's visiting area are subject to unclothed body searches. The unclothed body search includes, among other things, asking the inmate to turn around, squat, pull his buttocks apart, and cough. The use of a flashlight is permitted during these searches to aid officers in determining whether an inmate may have hidden contraband within a body crevice. It is a concern of custody staff that inmates may bring contraband into the prison after meeting with friends and family.

17. The facts of the search are disputed. Plaintiff makes the following allegations in his complaint (Dkt. No. 14 at 4):

> On 2-11-07 plaintiff being strip-searched leaving the visiting room by a CO J. Johnson, was ordered to perform one part three times, i.e. "the spreading the butt-cheecks (sic) and coughing." CO J. Johnson[,] removing his flashlight on the third time said, "[W]hat we are going to do it, you['re] going to turn around and show me your ass." CO J. Johnson became sexually aroused, having a buldge (sic) in his pants, and plaintiff made a comment, and CO J. Johnson cuffed [me] and took [me] to center complex. There CO J. Johnson challenged plaintiff to a fight with five other officers in the room. . . .[10]

---

[10] In his declaration, plaintiff alleged in pertinent part (Dkt. No. 39-10 at 3-4):

On February 11, 2007 I had a visit with my mother and niece in Solano State Prison visiting room. When I left the visiting room I entered the search area for inmates leaving and coming to visits. Officers Price and J. Johnson were in charge of searching the inmates[.] I was asked by J. Johnson to step into a stripout room. I went through the normal strip-out process, but J. Johnson asked to due (sic) it again and I complied.

After going through the whole routine twice as I was reaching for my boxers, officer J. Johnson told me I had to do it again, I replied "the whole thing" and "what for/what's up," he told me to do the last part and jester[ed] with his finger as to say lets go. I again asked "what's-up," "what's all this for" as I stood in front of him nude holding my boxers covering my private parts. I was relocated and before I could ask any more questions officer J. Johnson stated to me[,] "what we are going to do it, you['re] going to turn around and show me your ass." At that same time, he was pulling out his flashlight. As I turn[ed] I said, "what kind of shit is this," I bent over and spread my butt cheeks and cough[ed] three times.

When I finish[ed] I reach[ed] for my boxers again which were next to me on the table, I was facing the wall with officer J. Johnson to my left side and as I looked in his direction I noticed a bulge in his pants. What made me look in that direction was him putting away his flashlight. As I hurried to put my cloth[e]s on

17

1

2      I asked him[,] "what kind of man are you[;]" he replied "one doing his job[;]" I asked him what was he looking for, and if that is his job he has a punk ass job.

3 Officer J. Johnson told me to shut-up, by his time I was fully dressed, he made several comments such as "I can make you get naked as many times I want,"

4 "close your mouth right now," "youa punk" (etc.) something's (sic) I can't recall. Once fully dressing I began heading toward the grill-gate officer J. Johnson told

5 me that I talk to[o] much and I re[p]lied that "you tell little boys to shut-up and you the boy here so I should be telling you to shut-up[;]" he stopped me from

6 going out the gate, told the control officer to close the grill-gate and then told me to turn around and he cuffed me. [¶] Officer J. Johnson then escorted me to

7 center complex, on the way he told me, he is going to see how bad I am . . . .

8      Plaintiff testified in pertinent part at his deposition (Pltf. Depo. at 39-43, 81-82; <u>see also</u>

9 Dkt. No. 39-6 at 55 (plaintiff's corrections to his deposition transcript):

10      Well, I went through the normal process. The spreading your hands, undressing myself first. You take your clothes off. You put them on the back of a chair. [¶]

11 And then Officer Johnson searched my clothes. And he removed the clothes from the chair to the table. As you take them off and put them on the chair he picks

12 them off and puts them on the table. [¶] Then once I was fully nude I faced Officer Johnson. Showed him my hand. I opened my mouth, showed the inside

13 of my mouth. I pulled my ears back. I don't have no hair so I didn't rub on my head. I turned around, showed him the back of my feet. I squatted, spread it, and coughed three times.

14

15      . . . Officer Johnson asked me to do it over again. And when I asked him what do he mean by that he said, do it over again. And as I proceeding to do the whole

16 thing, he said, no, the last part. Turn around and squat. So I did it again. . . .

17      . . . Officer Johnson asked me to do it again. . . I opposed it. . . . I questioned. . . . I asked him why. Why -- why I got to do it again. I asked him what's up. . . . He

18 told me that what you're going to do is you're going to turn around and show me your ass. . . . I turned around and did it. . . . [A]s I was getting up from the

19 squatting position I noticed the Officer Johnson was putting away his flashlight and that he had a bulge in his pants. . . .

20     Q.    Now, what was he using the flashlight for?
    A.    To shine it on my butt.

21     Q.    Had you ever before had a flashlight be used by an officer during an unclothed body search?

22     A.    No, sir.
    Q.    Have you had a officer use a flashlight during an unclothed body search

23          since then?
    A.    No, sir.

24     Q.    And you said that Officer Johnson, you believe, had a bulge in his pants?
    A.    Yes, sir, that's what I believe.

25     Q.    And where was the bulge in his pants?
    A.    Where was it located at?

26     Q.    Yes.

18.   Defendant J. Johnson testified at his deposition that, due to plaintiff's refusal to comply with the routine procedures of the search, defendant had to issue several commands to plaintiff to comply.   J. Johnson testified that plaintiff became very animated, and became verbally volatile and abusive toward defendant during the final part of the search, calling defendant names and appearing angry.   J. Johnson testified that he had to ask plaintiff "to squat and cough multiple times" because plaintiff would not do so when asked.   J. Johnson has no recollection of shining a flashlight on plaintiff's buttocks during this search.   Defendant J. Johnson testified that he was not sexually aroused during his search of plaintiff.

(J. Johnson Depo. 37:1-40:25; J. Johnson Answ. to Amd. Interr. Nos. 3-5.)

---

| | |
|---|---|
| A. |  In his penis area. |
| Q. | And what do you think was causing the bulge? |
| A. | I don't know. |
| Q. | Do you think he had an erection? |
| A. | I would only be speculating. |
| Q. | All right.  So after Officer Johnson put his flashlight away after you had gone through the process of squatting and coughing three times what happened at that point? |
| A. | I put my clothes back on.  And in the process of putting my clothes back on I confronted Officer Johnson regarding the flashlight and why did he have me do this process this many times. . . . I can't recall everything, but he told me that he can do what he wanted to do. . . . I stepped outside the room, and I was standing by the door, buttoning up my shirt, and . . . Officer Johnson told me I talk too much.  And I told Officer Johnson, I basically say what I want to say, I'm a grown man.  And Officer Johnson cuffed me up and escorted [me] to center complex. . . . |
| Q. | In your 19 years in prison have you [] been asked to repeat that last portion of the strip-out procedure before? |
| A. | Never. |
| Q. | You stated that he had a bulge in his pants in his penis area.  I think you said you believed he did.  What was that belief based on? |
| A. | Well, when I turned to get my stuff, the way my body was positioned and by Officer Johnson being approximately like six five and me already bent over, my eye level was right there.  And he -- and what brought my attention to that particular area was he had his flashlight at his waist in his utility belt.  And that's when I seen the bulge.  And I didn't pay attention, I didn't focus, because I was annoyed and offended. |
| Q. | Did you think it was a weapon? |
| A. | No, I think it was a "wrench" (erection).  I thought it was a sex play . . . |

19.  What transpired next is also disputed.  J. Johnson testified that plaintiff refused orders to leave the search area, so J. Johnson placed plaintiff in handcuffs and escorted him to the Facility 3 program office where, states defendant, he "counseled the plaintiff on the need to comply with verbal orders during the unclothed body search so that the plaintiff could be processed through quickly.  [I] then returned to [my] post."  (J. Johnson Answ. to Amd. Interr. No. 8.)  Defendant avers that, thereafter, "he has no recollection of speaking with anyone about his interactions with the plaintiff on or about February 11, 2007, at any time prior to the initiation of this lawsuit."  (Id., Interr. No. 9.)

20.  Plaintiff testified that, after defendant J. Johnson handcuffed plaintiff, he placed plaintiff in a holding cage and removed the handcuffs.  Plaintiff stated that J. Johnson returned fifteen minutes later and escorted plaintiff, unhandcuffed, to the Facility 3 Program Office ("center complex").  Plaintiff testified that in the conference room were COs Ramirez, Abella and Medina, Sergeants Fowler and Fernandez, an unnamed Sergeant, and defendant J. Johnson.  Plaintiff testified that J. Johnson took off his glasses, put on black gloves, and asked plaintiff, "What [do you] want to do, what's up, [you] got a big mouth, and so forth," as he stepped in front of plaintiff with his fists balled.  Plaintiff states that he and J. Johnson exchanged several comments, that J. Johnson called plaintiff a fool and asked him what he was going to do, that plaintiff called J. Johnson a fool but said, "I'm not going to do nothing."  "After about five or ten minutes of this Sgt. Fowler intervened and told officer Ramirez to go search my property and told him, "you know what to do," and told J. Johnson to step out.

 (Pltf. Depo. 43:22- 48:11; Pltf. Decl. ¶¶ 15-18.)

21.  Although plaintiff testified that defendant J. Johnson made threatening gestures toward plaintiff, and allegedly sought to provoke him into a fight, plaintiff stated that J. Johnson made no physical contact with plaintiff.  (Pltf. Depo. 47:15-16.)

22.  Defendant Fowler is a correctional sergeant employed at CSP-SOL.  Defendant Fowler avers under penalty of perjury that he has no recollection of being in the

Facility 3 Program Office on February 11, 2007, when plaintiff was allegedly brought there by

defendant J. Johnson.  Defendant Fowler states that he has no recollection of any of the events

that plaintiff alleges took place that day.  (See generally Fowler Ans. to Amd. Interr. Nos. 2 -10.)

23.  Pursuant to his deposition testimony and sworn declaration, plaintiff alleges

that, after J. Johnson left the conference room, defendant Fowler rushed up on plaintiff, while

officers Medinna and Abella held plaintiff against the wall.

a.  As set forth in plaintiff's declaration (Pltf. Decl. ¶ 19 (sic)):

> Sgt. J. Fowler bumped me with his stomach and called me a bxxch
> and told me who the fuxx I think I am talking to his officer like
> that and I am going be his bxxch for now own, I replied by calling
> him a bxxch. Sgt. Fowler bumped me approximately three times
> telling me to ball my fist "I dare you," must of the things I didn't
> reply to, however I did tell him that he was a coward caused he
> needed his home boys and that he was taking up for the pervert
> who dxxk got hard by shine flash light up my ass, so who the
> bxxch.  I also told him that I was a lifer and trying to go home, so I
> aint going to do nothing.  Sgt. Fowler got so close in face telling
> me to swing "so I can beat your black ass" this was when spit from
> his mouth hit me in my face.  The other two officers on my sides
> where pressed up against me real hard.  When Sgt. Fowler seen the
> spit on my face he step back out my face and said "yea!" "what you
> going to do," I felt degraded.  He sat on the edge of the table and
> told me that I was his bxxch and he is going to make sure that I go
> to the hole and he is stealing my property, he said, since I'm a lifer
> he was going to make sure I get a parole denial.  He told me I was
> coward and this is how he treat his bxxches.

(See also Pltf. Depo. at 48-53; 83-84.)

b.  Plaintiff avers that defendant Fowler then told plaintiff "to get out and

wait on the bench[;] I had been in the room approximately 30 minutes and as I was waiting on

the bench officer Ramirez walk in with my T.V. and Radio.  I was then allowed to leave and go

back to the building.  When I got to my bunk area Ramirez had search[ed] and trash[ed] my

personal property. . . . [T]hey refuse[d] to give me back my identification card [so] I was forced

to go without receiving my medication, which cause[d] me to not be able to sleep for

approximately three days."  (Pltf. Decl. ¶ 20.)

c.  Plaintiff alleges that, following this incident, defendant Fowler "made it

1    a point at least three or four times . . . to walk directly in front of me forcing me to step out of the

2    way, it got to the point that I would look for him on the yard just to avoid him."  (Id. ¶ 22.)

3            24.  On February 14, 2007, plaintiff signed and submitted an administrative

4    grievance (Log No. CSP-S-07-02026), challenging the alleged sexual harassment by defendant J.

5    Johnson, and the alleged incidents in the conference room, including the confiscation of

6    plaintiff's property, wherein plaintiff noted the presence and alleged conduct of the other officers,

7    but identified only J. Johnson.  (Dkt. No. 39-4 at 3-5.)

8            a.  On February 22, 2007, the appeal was returned to plaintiff by Inmate

9    Appeals Coordinator Cervantes, with a notation that the appeal was "incomplete," because

10   "without supporting documentation," specifically, that it failed to identify which of three CSP-

11   SOL correctional officers named "J. Johnson" whom plaintiff referenced, and failed to include a

12   search receipt.  (Id. at 10.)  The next day, plaintiff submitted an "Inmate Request for Interview,"

13   wherein he stated that he had no search receipt, and that there was only one J. Johnson working

14   in the visiting room on Sunday, February 11, 2007.  (Id. at 11.)

15           b.  On February 16, 2007, plaintiff wrote a letter to the Internal Affairs

16   Office, describing the alleged February 11, 2007 incidents, without identifying any correctional

17   officers.  Plaintiff stated that, as a prisoner, he had been a victim of retaliation and religious

18   discrimination, had his personal property taken by staff, and been in verbal and physical

19   confrontations, but "by far this is the worse of the worse to have the integrity of my manhood

20   aggress upon in such a manner;" plaintiff stated that he was "completely at a lost (sic) of

21   resolution on how to deal with this situation."  (Dkt. No. 14 at 22.)

22           c.  On March 4 or 6, 2007, plaintiff wrote a letter to "All Concerned

23   Parties," wherein he asserted that "[t]he appeals coordinator has unreasonably denied to process"

24   plaintiff's appeals, noting in pertinent part that the appeals coordinator could readily identify the

25   correct "J. Johnson," based on the date and location of the challenged incident, or should simply

26   "process the appeal, because the hearing officer as part of the investigation can easily uncover

1   which J. Johnson is being spoke[n] of." (Dkt. No. 39-4 at 9.)

2          d. On April 17, 2007, plaintiff wrote a letter to the Chief of Inmate

3   Appeals, inquiring about the status of his appeal. (Dkt. No. 14 at 27.)

4          e. On June 6, 2007, Inmate Appeals Chief Grannis returned plaintiff's

5   submissions, on the ground that plaintiff first needed to exhaust his appeal through the second

6   level before seeking Director's Level Review. (Dkt. No. 39-4 at 8.)

7          f. On June 8, 2007, Warden Sisto sent plaintiff a letter responsive to

8   plaintiff's "letter addressed to the office of the Inspector General, dated March 4, 2007." (Dkt.

9   No. 14 at 32.) Sisto identified each of plaintiff's concerns, relative to the Religious Diet

10   Program, the alleged sexual misconduct, and the confiscation of plaintiff's property. Sisto

11   generally noted that it was his "expectation that every staff member conduct themselves in a

12   professional manner." (Id.) Finally, Sisto noted that, because plaintiff was pursuing these

13   matters through the administrative grievance process, "[i]t would be inappropriate to provide you

14   answers in this format as you have chosen to exercise your right to utilize the appeal process."

15   (Id.)

16          g. In a decision rendered August 22, 2007, pursuant to a First Level

17   Review of Log No. CSP-S-07-02026, CSP-SOL Associate Warden Brumfield noted that plaintiff

18   had been interviewed by Sergeant Oliver, on August 11, 2007, who explained that defendant J.

19   Johnson's conduct complied with the strip-search procedures following inmate visitations;

20   Brumfield further noted that plaintiff had informed Sergeant Oliver that his property was

21   returned. On these bases, plaintiff's appeal was "granted" at the First Level. (Dkt. No. 39-4 at 4,

22   13.)

23          h. On November 17, 2007, a Second Level Review, signed on behalf of

24   defendant Sisto, also "granted" the appeal, on the ground that plaintiff's request for an

25   explanation of the procedures pertaining to unclothed body searches had been provided. The

26   decision found that plaintiff had "failed to provide compelling evidence or facts to substantiate

1   your claim that staff acted in a less than professional manner." (Dkt. No. 14 at 20.) Plaintiff did

2   not further pursue this twice "granted" administrative grievance.

3        25.  Meanwhile, on April 26, 2007, plaintiff was placed in Ad Seg.

4        26.  Defendant Jackura, who has been employed by CDCR since 1995, is a

5   correctional counselor at CSP-SOL, and was plaintiff's assigned counselor during the relevant

6   period. Defendant San Nicholas is a correctional officer at CSP-SOL, employed with CDCR for

7   approximately 24 years. Defendant Kesterson was a correctional lieutenant at CSP-SOL during

8   the relevant period; she is now a correctional captain with CDCR's Out-of-State Correctional

9   Facilities.

10       27. Under CDCR policy, when an inmate's presence in an institution's general

11  population presents an immediate threat to the safety of the inmate or others, endangers

12  institutional security, or jeopardizes the integrity of an investigation of an alleged serious

13  misconduct or criminal activity, the inmate shall be immediately removed from the general

14  population and placed into Ad Seg.

15       28.  If a staff person at CSP-Solano reports that he is concerned about his safety

16  due to an inmate, that inmate will be automatically placed in Ad Seg.

17       29.  The decision to place an inmate in Ad Seg may be discussed with the sergeant

18  on a facility, but the ultimate decision lies with the lieutenant or above.

19       30.  It is standard CDCR practice for correctional counselors to conduct an annual

20  review of the central file of each inmate he or she is assigned. It is also standard practice for the

21  correctional counselor at a sending facility to review an inmate's central file before endorsing the

22  inmate for transfer to a new facility. Typically, when an inmate is transferred, his central file is

23  not immediately available for review. The transferred inmate is asked to complete a form CDC-

24  128X, which enables the receiving facility to make an initial determination about the inmate's

25  housing, e.g., racial compatibility, enemy concerns, gang affiliations, medical concerns, etc.

26  Plaintiff asserts that an additional purpose of the form CDC-128X is to determine whether an

1   inmate poses a threat to officer safety.

2          31.  On or about April 26, 2007, defendant Jackura conducted a review of

3   plaintiff's CDCR central file.  Jackura asserts that the review was routine; plaintiff asserts that

4   the review was undertaken, in conspiracy with the other defendants, with the intent to contrive a

5   reason to move plaintiff to Ad Seg.

6          32.  Defendant Jackura avers that, during the course of his allegedly routine

7   review of plaintiff's central file, he found a CDC 115 (also known as a "rules violation report" or

8   "RVR"), that indicated plaintiff had been found guilty of a 1997 battery on CO San Nicholas,

9   when plaintiff was previously incarcerated at CSP-SOL.  Jackura states that he has no

10  independent recollection of informing San Nicholas of plaintiff's renewed presence at CSP-SOL,

11  but that he has no reason to doubt the accuracy of the general chrono later authored by Lt.

12  Kesterson which states that Jackura, upon discovering the 1997 RVR, so informed San Nicholas.

13  (Jackura Ans. to Amd. Interr. No.  3).  See Apr. 26, 2007 CDC-128-B (General Chrono/Ad Seg

14  Unit Placement Notice), prepared by Lt. Kesterson (Dkt. No. 14 at 29; Dkt. No. 33-6 at 19).  Lt.

15  Kesterson avers that Jackura so informed her.  (Id.)  Jackura states that he has no recollection of

16  speaking about plaintiff with any correctional officers during the period January through April

17  2007, or of speaking with defendant Fowler on or about April 26, 2007, regarding plaintiff's

18  placement in Ad Seg.  (Jackura Ans. to Amd. Interr. Nos. 4, 5.)

19         33.  Defendant Kesterson's Ad Seg placement notice states that she interviewed

20  San Nicholas on April 26, 2007, at approximately 9:00 a.m., and reminded him of the 1997

21  RVR, which she summarized as follows (Dkt. No. 14 at 29; Dkt. No. 33-6 at 19):

22         Specifically, on 7/03/97, at approximately 2105 hours, as
           Correctional Officer San Nicholas was attempting to place Inmate
23         Johnson into handcuff[s,] Inmate Johnson resisted by swinging his
           right arm round to his rear[,] sticking (sic) Officer San Nicholas'
24         left forearm with his right arm.  Inmate Johnson then started to
           walk away, stopped[,] turned quickly and attempted to strike
25         Officer San Nicholas.  Inmate Johnson was found guilty of the
           charge and subsequently transferred to a level V institution.
26         Inmate was transferred to CSP-Solano, Level II on 1/9/07.

1   (See also San Nicholas Ans. to Amd. Interr. No. 7.)

2          34.  In answers to interrogatories, defendant San Nicholas states that he first

3   learned of plaintiff's 2007 incarceration at CSP-SOL when so informed by defendants Jackura

4   and Kesterson on April 26, 2007; that this information gave San Nicholas "concerns for his

5   safety" (although San Nicholas clarified that he "did not use the term 'threatened'"), and so he

6   requested that plaintiff be moved to administrative segregation and transferred to another

7   institution.  (San Nicholas Ans. to Amd. Interr. Nos. 5-7.)

8          35.  Plaintiff asserts that he did not pose a threat to institutional security at CSP-

9   SOL in April 2007, and that his Ad Seg placement was the result of a conspiracy by defendants

10  (apparently referencing defendants J. Johnson, Fowler, Jackura, San Nicholas and Kesterson), to

11  retaliate against plaintiff for verbally challenging the authority of CSP-SOL officers, and filing

12  the grievance against defendant J. Johnson.

13         36.  Plaintiff challenges any inference that CSP-SOL prison officials were

14  unaware of plaintiff's 1997 RVR until defendant Jackura reviewed plaintiff's central file on

15  April 26, 2007.  Plaintiff asserts that, even if his central file was not available for review when he

16  was transferred to CSP-SOL, defendant Jackura, on January 9, 2007, approved and signed

17  plaintiff's "Initial Housing Review" intake form, which denoted with an asterisk, in the box

18  entitled "Other Special Concerns," that plaintiff had a "Battery on Staff at Solano."  (See Dkt.

19  No. 39-2 at 3.)  Moreover, plaintiff avers that, upon his arrival at CSP-SOL, Lt. Kesterson

20  expressly discussed with him the 1997 incident and, based on plaintiff's assurances, cleared

21  plaintiff for the yard.

22         37.  Plaintiff disputes defendants' averment that the first time San Nicholas

23  became aware that plaintiff was incarcerated at CSP-Solano was on April 26, 2007, when so

24  informed by Jackura, and that San Nicholas felt threatened when he learned of plaintiff's return

25  to CSP-SOL.  Plaintiff testified at his deposition that, in January or February 2007, shortly after

26  his transfer to CSP-SOL, he had interactions with San Nicolas four or five days in a row, and that

these interactions support a reasonable inference that San Nicholas recognized plaintiff and had

no safety concerns.  Specifically, plaintiff avers that San Nicolas worked for four or five days in

Building 17, where plaintiff was housed; that, during this time, San Nicolas wrote plaintiff a pass

to the visitor center, and unlocked the door for him to go to and from the yard; and that, when

San Nicholas processed plaintiff's pass to the visitor center, it had plaintiff's name and CDCR

number on it.  Plaintiff states that, on one occasion, he told San Nicholas his name and CDCR

number; and, on another occasion, he showed San Nicholas his identification card containing

plaintiff's name, number and picture.  (Pltf. Depo. 56:5-58:14.)

　　　　38.   San Nicholas states that he was not an officer in Building 17, but worked as

an escort officer, and may have worked in Building 17 during an overtime shift; however, San

Nicholas states that he has no recollection of seeing plaintiff during this period of time.  (San

Nicholas Ans. to Amd. Interr. Nos. 3, 4.)

　　　　39.   The Ad Seg lock-up order was served on plaintiff by defendant Fowler.  (See

Dkt. Nos. 14 at 30; 33-6 at 49.)  As recalled by defendant Fowler, in response to questioning by

plaintiff's counsel (Fowler Depo. 37:19-38:1):

> Q.   [W]hat was your involvement with [plaintiff] being sent to administrative segregation?
> A.   I believe I served his lock-up order that was initiated by the lieutenant [Kesterson] who has the authority to make the decision that he go to Ad Seg.  So it's common practice that the sergeant [Fowler] issue the inmate his lock-up order, read it to him, and ask him if he understands it and if he would like to sign it or not.
> Q.   Okay.  Explain what happened before you served.
> A.   I have no idea who Oshay Johnson is.  And I serve lock-up orders every day because people go to Ad Seg.  So I did see where I had signed the lock-up order, but I couldn't tell you any specifics about why he was going to Ad Seg or who initiated it.  But the sergeant cannot physically place an inmate in Ad Seg; it has to come from a lieutenant or above.  It's the duty of the sergeant to sign it, issue it to the inmate prior to him leaving the general population going to Ad Seg.  So I did get to see where I signed that he did go to Ad Seg, his lock-up order.  But I couldn't tell you any specifics about why, or the date it was, or what happened that day to the individual, or anything.

////

40. Plaintiff's recollection of defendant Fowler serving plaintiff the Ad Seg lock-up order is distinctly different (Pltf. Decl. ¶¶ 23-24):

> On the day of 4-26-07 I went to ad-seg, I was called to center complex, I was took in the same room of the indecent (sic) on 2-11-07. There was a chair in the middle of the room, and Sgt. Fowler was sitting at the computer at the back of the room with my central file in his lap. Sgt. Fowler told that he had to send me to the hole, I laughed and said, "you still standing up for that dude." He replied, "something like that," he went on to tell me that I had an assault on San Nicholas and he is threaten[ed] by my presents (sic) and wants me placed in ad-seg and transferred. I told him San Nicholas knew I was here 4 months ago, Sgt. Fowler said, counselor Jackura called and told him that he had talked to San Nicholas and that was told to him. Sgt. Fowler said, "you know the business" "I got [to] do what I got to do."
>
> I told Fowler that I was cleared by Lt. Kesterson and she is right out front, I asked to talk to her. He called her in, and she said she do remember letting officer San Nicholas know of my arrival and he had no problem with it, she said let her make some calls and stepped out. Sgt. Fowler stepped out for about two minutes came back with an officer and told me he was going to get me medically cleared for ad-seg [while] Lt. Kesterson check into things. I got medically cleared and when I got back Lt. Kesterson came in and told me that San Nicholas is acting like he does not remember, and she said she called her captain, Capt. N. Fry, and she said lock me up. I told Fowler that he is playing a cold game he said some along the lines of, this is how I do it, he did tell me straight up, "we don't want you here."

(See also Pltf. Depo. 85:24-88:21.)

41. The parties agree that lengths of stays in Ad Seg vary greatly depending on the reason for the placement. Inmates awaiting transfer to other institutions must frequently wait a substantial length of time for a bed to become available in another institution (although plaintiff denies that this factor contributed to his 17-month stay in Ad Seg at CSP-SOL). Generally, inmates in Ad Seg awaiting transfer would not be transferred if they are awaiting a scheduled hearing before the parole board. (Plaintiff asserts that this factor did not contribute to the length of his Ad Seg placement because his parole hearing was never actually calendared and, even when the Institutional Classification Committee ("ICC") realized that no hearing was pending, it still declined to transfer plaintiff.)

42. The ICC initially reviewed plaintiff's Ad Seg placement on May 3, 2007. It was noted that plaintiff's placement was based on "staff safety concerns," and that San Nicholas had requested that plaintiff be moved to Ad Seg and transferred to another institution. It was further noted that plaintiff's Initial Parole Consideration Hearing ("IPCH") appeared to be scheduled for June 2007. It was determined that plaintiff would be retained in Ad Seg "pending [Parole] Board action and subsequent transfer." (Dkt. No. 33-6 at 21.)

43. The ICC next reviewed plaintiff's Ad Seg placement on July 12, 2007. The same reasons were noted for plaintiff's placement. It was further noted that plaintiff's IPCH "was tentatively scheduled for 6/2007, however due to an administrative error the Board desk was not aware that the subject should have been on calendar. At this time his Board Report is just being assigned to a CCI [Correctional Counselor I] for completion. This process will be expedited, if at all possible. An additional ASU [Administrative Segregation Unit] extension is needed to complete the Board Report and subject will be reviewed again by ICC, for possible transfer consideration, upon completion of subject's Initial Board Report." (Dkt. No. 33-6 at 23.) It was again determined that plaintiff would be retained in Ad Seg pending the Board's action and plaintiff's subsequent transfer. (Id.) However, as plaintiff now emphasizes, this "report does not say that a parole hearing is pending but rather that Plaintiff will be held in administrative segregation until the parole board takes action." (Pltf. Rsps. to Dfs.' UF No. 108.)

44. The ICC next reviewed plaintiff's Ad Seg placement on September 13, 2007. The same reasons were noted for plaintiff's placement. It was noted that "the Board desk was contacted and states subject's Board Report has been completed by CCI Jackura and [plaintiff] will not be placed on calendar until March 2008 according to Sacramento's scheduling. Due to subject's anticipated BPH date being over three months away, the recommendation is to refer subject for transfer to an alternate facility." (Dkt. No. 33-6 at 25.) It was determined that plaintiff would be retained in Ad Seg "pending transfer." (Id.) Plaintiff requested that he be transferred to CMF or San Quentin to remain close to his family in Sacramento.

45.  On October 5, 2007, Classification Staff Representative ("CSR") Donnelly noted that CMF had declined plaintiff's transfer, and that San Quentin was closed to intake; however, plaintiff was accepted to the California Substance Abuse Treatment Facility ("SATF"), located at CSP-Corcoran.  CSR Donnelly approved plaintiff's Ad Seg retention pending plaintiff's transfer.  (Dkt. No. 33-6 at 27.)

46.  The ICC again reviewed plaintiff's Ad Seg placement on January 10, 2008. The same reasons were noted for plaintiff's Ad Seg placement.  It was further noted that "the subject is scheduled to appear before the BPH on 1-30-08," and that plaintiff's "transfer will no[t] occur until after the BPH."  (Dkt. No. 33-6 at 29.)

47.  The plaintiff was again seen by the ICC on July 10, 2008.  The ICC noted that, while in Ad Seg, plaintiff had "completed zero periods disciplinary-free, and zero periods assigned to work.  [His] score has increased to 31 due to 3 disciplinaries [but plaintiff] has a mandatory minimum of 19.  BPH postponed until 6/09."  (Dkt. No. 33-6 at 31.)  It is unclear whether plaintiff's BPH was postponed due to plaintiff's Ad Seg disciplinary record. Nevertheless, the ICC elected to retain plaintiff in administrative segregation pending only his transfer to another prison.  (Id.)

48.  Plaintiff was released from CSP-SOL Ad Seg, and transferred to Pleasant Valley State Prison, on September 10, 2008.

49.  Plaintiff alleges that, due to his 17 months in Ad Seg, he lost weight, lost sleep, developed migraine headaches and bed sores, became depressed and had a mental breakdown.  Plaintiff also alleges, inter alia, that he was unable to have a contact visit with his father, who died while plaintiff was in Ad Seg, and that his grandparents were twice denied visitation.  Plaintiff avers that he was found guilty of three false rules violations, at least one set up by defendant J. Johnson, who worked in Ad Seg three days each week.  Plaintiff also avers that defendant Jackura prepared plaintiff's Parole Board Report without interviewing plaintiff and that the report contained false information.

50.  Meanwhile, on May 22, 2007, plaintiff signed and submitted an administrative grievance challenging his placement in Ad Seg and requesting his return to the general prison population  (Log. No. CSP-S-07-01570).  (Dkt. No. 33-6 at 45-48.)

a.  Plaintiff averred that he did not pose a threat to the safety and security of the prison, and opined that the asserted rationale for his placement, based on a "10 year old incident," "has a scent of vindictiveness" (id. at 48).  Plaintiff explained that the CSP-SOL officers, including San Nicholas, were aware of plaintiff's presence at the time of his transfer.  In pertinent part, plaintiff wrote the following (referring to himself as "appellant") (id. at 47):

> Appellant arrived here at CSP-Solano III Yard 1-9-07.  Upon arrival he was interviewed by Lt. Kesterson (normal procedure).  She questioned appellant about the 7-3-97 incident, and inform[ed] him that Officer San Nicholas was not assigned to the yard but do work over there sometime on the yard.  Appellant was asked what was his present feelings toward the incident, and could he program on the yard.  Appellant ensured (sic) that he had no intentions of doing anything that would conflict his program, and expressed his concerns on the fact he had a Parole Board Hearing coming up in June (6 months).  Appellant was cleared to the yard by Lt. K. Kesterson.
>
> Within 30 days (1-23-07) appellant was interviewed by Counselor Shaviz, and participated in a Classification Committee [meeting].  In the committee, and interview, the battery incident was addressed, and in fact counselor Shaviz inferred that CO San Nicholas had been contacted by stating, "Well I guess here is where they contacted San Nicholas," and at committee the CCI questioned appellant about seeing CO San Nicholas and how was things . . . Again appellant was cleared to the yard to program.

b.  On June 28, 2007, plaintiff's appeal was denied at the First Level Review by Capt. Fry, acting on behalf of Associate Warden Moore.  (Dkt. No. 33-6 at 51-52.)  The decision noted plaintiff's concern "that you are scheduled for a Parole Board Hearing within 30 days and are concerned that your present housing in ASU may have a prejudicial impact on the hearing."  (Id. at 51.)  Based on a June 27, 2007, interview of plaintiff by Lt. Parks, "a review of your central file, interviews with staff and a review of the appeal," the First Level decision concluded that, "[a]lthough your file was screened on your arrival date and further reviewed

during initial classification it appears that Officer San Nicholas was not made aware of your

presence at the institution until April 26, 2007." (Id.)  The decision noted that plaintiff's transfer

had been delayed "due to the close proximity in time of your scheduled board hearing," and

concluded that plaintiff would "remain in the ASU pending your scheduled board hearing and

subsequent transfer."  (Id. at 52.)

              c.  It appears that plaintiff did not further pursue this appeal.

VI.  Discussion

    A.  First Amendment Right to Exercise Religion

       1.  Introduction

          The court initially notes two pertinent changes to CDCR regulations implemented

on February 2, 2010.  While these changes do not directly impact the merits of plaintiff's claims

regarding the confiscation of his Religious Diet Card in 2007, they provide an important

perspective.

          First, the regulations now expressly provide that an inmate with a Religious Diet

Card issued by one institution, who is transferred to another institution, shall be able to

participate in the receiving institution's Religious Diet Program.  See 15 U.S.C. § 3054(c);

California Regulatory Notice Register ("Register") 2010, No. 6.  As stated in CDCR's January

12, 2009 Initial Statement of Reasons ("ISOR") for this proposed change:

> Subsection 3054(c) is amended to clarify that religious meals will
> not be restricted based on classification, housing placement, or
> transfers between institutions.  Additional language also clarifies
> that transferred inmates shall have the ability to continue in their
> current Religious Diet Program at the receiving institution, barring
> medical needs or other extraordinary circumstances.  Extraordinary
> circumstances that might prevent a transferred inmate from
> continuing in his or her Religious Diet Program may include, but
> are not limited to, natural disasters or security emergencies such as
> prison riots.

CDCR ISOR Jan. 12. 2009, at 2.  The pertinent CDCR regulation now provides:

> Inmates who are transferred shall have the ability to continue

1    participating in their current Religious Diet Program at the
2    receiving institution, barring medical needs or other extraordinary
     circumstances.

3    15 U.S.C. § 3054(c).

4            Second, CDCR implemented a statewide "Religious Meat Alternate Program,"

5    that provides halal meat as a religious diet option.[11]  The January 2009 ISOR explained:

6            The existing regulations were intended to offer religious dietary
             accommodations for inmates, subject to the Religious Land Use
7            and Institutionalized Persons Act of 2000 (RLUIPA).  These
             regulations nevertheless did not include religious dietary
8            accommodations specifically for Muslim inmates.  Currently, there
             are other correctional systems and institutions within the nation
9            that offer halal meat as a religious accommodation to Muslim
             inmates.  Halal meat is religiously prepared meat that is
10           slaughtered to Islamic specifications.  The CDCR has now
             determined that it is necessary to amend its own regulations to
11           provide a halal meat option.  A halal meat option would bring
             CDCR into further compliance with the RLUIPA and would assist
12           CDCR to defend against pending litigation regarding its existing
             religious diet regulations.  This action would accordingly make
13           provisions for a new halal meat alternate program, as a third
             religious dietary option for inmates.  The halal meat alternate
14           program would be available in all CDCR adult institutions
             statewide.  Participation in the program would be open to Muslim
15           inmates and other inmates with a religious need to consume halal
             meat, as determined by a Muslim Chaplain.

16

17   CDCR ISOR Jan. 12. 2009, at 1.  This proposal was incorporated in CDCR's regulations:

18           3054.3.  Religious Meat Alternate Program.

19           (a) Religious meat alternates (meat that has been certified as
             halal) shall be available at all institutions.  Muslim inmates may
20           participate in the program, as determined by a Muslim Chaplain or
             designee Chaplain. . . .

21

22   15 U.S.C. §§ 3054.3(a) et seq.

23

24           [11]  One result of implementing the Religious Meat Alternate Program,  was amendment to
     the vegetarian diet option, which is now "available to inmates who seek that option based on a
25   personal or ethical need. . . . [that] does not need to be religious in nature."  CDCR ISOR Jan.
     12. 2009, at 1.  Hence, the name of this dietary option was changed from "religious vegetarian
26   diet" to "vegetarian diet."  Id.

1    Against this current backdrop, the court examines plaintiff's challenges to the

2  confiscation of his Religious Diet Card in 2007.

3         2.  Legal Standards

4    "[A] prison inmate retains those First Amendment rights that are not inconsistent

5  with his status as a prisoner or with the legitimate penological objectives of the corrections

6  system." Pell v. Procunier, 417 U.S. 817, 822 (1974).  A prisoner's rights under the First

7  Amendment's Free Exercise Clause are implicated when a prison official, without justification

8  that is reasonably related to a legitimate penological interest, burdens the prisoner's practice of

9  his religion by preventing him from engaging in conduct which he sincerely believes is consistent

10  with his faith.  Shakur v. Schriro, 514 F.3d 878, 884 (9th Cir. 2008) (the "sincerity test," not the

11  "objective centrality test," triggers application of the Free Exercise Clause); Malik v. Brown, 16

12  F.3d 330, 333 (9th Cir. 1994).  These rights include a prisoner's "right to be provided with food

13  sufficient to sustain [him] in good health that satisfies the dietary laws of [his] religion."

14  McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987) (per curiam).

15    In Turner v. Safley, 482 U.S. 78 (1987), the Supreme Court identified four factors

16  to be considered in evaluating the constitutionality of a prison regulation.  Accord, Beard v.

17  Banks, 548 U.S. 521, 528-29 (2006).  As later summarized by the Ninth Circuit, these factors

18  are:

19         (1)    Whether there is a valid, rational connection between the prison regulation
           and the legitimate governmental interest put forward to justify it;
20
           (2)    Whether there are alternative means of exercising the right that remain
21         open to prison inmates;

22         (3)    Whether accommodation of the asserted constitutional right will impact
           . . . guards and other inmates, and . . . the allocation of prison resources generally;
23         and

24         (4)    Whether there is an absence of ready alternatives versus the existence of
           obvious, easy alternatives.
25

26  Shakur, 514 F.3d at 884, citing Turner, 482 U.S. at 89-90 (additional citations and internal

quotation marks omitted).  These factors are to be considered in light of the competing principles that exist in a prison setting, specifically, that although prisoners retain some constitutional rights, the courts are ill-equipped to address matters of prison administration.  Turner at 84.  "To maintain the necessary balance between these two basic principles, [courts] must apply a deferential standard of review to challenges regarding prison regulations and uphold the regulation 'if it is reasonably related to legitimate penological interests.'"  Mauro v. Arpaio, 188 F.3d 1054, 1058 (9th Cir. 1999) (en banc), cert. denied, 529 U.S. 1018 (2000), quoting Turner, 482 U.S. at 89.

3.  Analysis

Defendants do not dispute that plaintiff's dietary preferences are premised on his sincerely held religious beliefs.  Further, although supporting documentary evidence appears to be lacking, defendants rely on the fact that "plaintiff admits that he followed this procedure [completion of a Religious Diet Request Form (Form 3030)] and submitted the request shortly after arriving in CSP-Solano." (Dfts.' Mtn., Dkt. No. 33-1 at 21; see also id. at 20.)  At the hearing on defendants' motion for summary judgment, defense counsel conceded, for purposes of the motion, that plaintiff timely submitted a Religious Diet Request.

It is also not disputed that plaintiff arrived at CPS-SOL with a Religious Diet Card, issued by Old Folsom State Prison, that plaintiff had used for the past year, without incident, to obtain meat-substitute meals at CCC.  Plaintiff obtained meat-substitute meals with this card for approximately four days at CSP-SOL, before the card was confiscated.

Finally, although defendant Carroll asserts a lack of recollection, he has presented no evidence to refute plaintiff's allegations, both at the administrative level and before this court, that, on January 14, 2007, Carroll confiscated plaintiff's Old Folsom meal card while verbally denigrating plaintiff's Islamic faith.  At the hearing, for purposes of this motion, defense counsel conceded that defendant Carroll confiscated plaintiff's Religious Diet Card, but not that Carroll denigrated plaintiff's religion.

1      Plaintiff does not challenge CDCR's regulations underlying the Religious Diet

2  Program, other than their failure to authorize one standard CDCR Religious Diet Card that an

3  inmate can use in all CDCR institutions.  Rather, plaintiff challenges defendants' contention that

4  Carroll's alleged conduct reflected reasonable and standard authorized procedures at CSP-SOL.

5      Initially setting aside plaintiff's allegations that defendant Carroll was motivated

6  by, and/or expressed, religious animus when he confiscated plaintiff's Old Folsom meal card, the

7  court first considers defendants' contention that Carroll's challenged conduct was authorized by

8  CSP-SOL policies that were reasonably related to the successful implementation and

9  enforcement of the Religious Diet Program.  It is defendants' contention that, during the relevant

10  period, it was "generally" the "standard practice" of staff to confiscate a Religious Diet Card

11  issued by another institution because the lack of a standard CDCR diet card rendered it

12  "impractical" or "impossible" to verify the authenticity of a card issued at a different institution,

13  and "there were frequent attempts by inmates to forge and otherwise tamper with" such cards.

14  (Sisto's Answer to Amd. Interr. Nos. 2, 3.)  Further, assert defendants, CSP-SOL officials

15  declined to issue temporary Religious Diet Cards because this option was not authorized by

16  department regulations.  (Id., Amd. Interr. No. 4.)

17      The existence and enforcement of defendants' asserted policy, and its underlying

18  rationale, are disputed based on the existing record.  Defendant's qualified language ("generally")

19  suggests inconsistent application of the policy, viz,. inconsistent confiscations of non-CSP-SOL

20  Religious Diet Cards by CSP-SOL staff (and hence the inconsistent honoring of such cards at

21  CSP-SOL).  This inference is supported by the undisputed fact that plaintiff was initially

22  permitted to retain his Old Folsom Religious Diet Card after his transfer to CSP-SOL, following

23  an official a search of his possessions.  It is more broadly supported, department-wide, by

24  plaintiff's use of his Old Folsom Religious Diet Card at CCC prior to his arrival at CSP-SOL,

25  and plaintiff's subsequent use of his PVSP Religious Diet Card at CMF.  In addition, defendants'

26  stated rationale for the asserted policy -- to stem the "frequent" attempts of inmates to forge

1    Religious Diet Cards, or use forged cards -- is not supported by the deposition testimony of

2    defendant Fowler.  Fowler stated that only forged Religious Diet Cards were confiscated at CSP-

3    SOL; he was not aware of the confiscation of any Religious Diet Cards solely because they had

4    been issued by another CDCR institution.  Moreover, although defendant Fowler testified that the

5    use of forged Religious Diet Cards is "common," he stated that he had confiscated only five or

6    six cards in ten years working at CDCR, and estimated that the last time he or another officer had

7    confiscated a forged diet card was five years before.

8            In support of their motion for summary judgment, defendants assert that it was

9    "standard practice" for CSP-SOL officials to confiscate Religious Diet Cards issued by other

10   institutions.  (Dkt. No. 33-1 at 20.)  However, noting defendant Fowler's testimony that "I would

11   never do that, and I don't know if anybody has" (Fowler Depo. 17:16-17), and his testimony that

12   correctional officers receive no training to implement or enforce the Religious Diet Program,

13   plaintiff persuasively asserts that defendants have failed to demonstrate any "standard practice."

14           Moreover, even if defendants' practice of confiscating all Religious Diet Cards

15   issued from other institutions was "standard," it appears, at least at this juncture, to fail the

16   Turner test.  The only governmental interest identified by defendants in support of the practice

17   was to prevent inmates, without the requisite religious beliefs, from obtaining "special food,

18   more of a certain kind of food, or food that was perceived as being better" (Dkt. No. 33-1 at 20).

19   Plaintiff persuasively responds that this goal lacks the imprimatur of recognized legitimate

20   penological interests, such as "the preservation of internal order and discipline, the maintenance

21   of institutional security against escape or unauthorized entry, and the rehabilitation of the

22   prisoners."  Procunier v. Martinez, 416 U.S. 396, 412 (1974).  Additionally, asserts plaintiff,

23   "there is no evidence that allowing a small number of [ineligible] inmates to receive a special

24   diet would create a 'significant financial and administrative burden,' Shakur, 514 F.3d at 886."

25   (Dkt. No. 39 at 16.)

26   ////

1    In support of a <u>Turner</u> analysis, defendants contend that an inmate retains an

2  alternative means for exercising his right to a religious diet, despite the confiscation of his

3  Religious Diet Card issued from another institution, specifically, that an inmate may comply with

4  the departmental procedures under Title 15 for submitting a Religious Diet Request

5  Form/application.  Defendants further contend that,"[i]n the meantime, [plaintiff] could have also

6  simply purchased food from the prison canteen, asked that his regular meals not include meat, or

7  avoided eating meat that was served to him." (Dkt. No. 33-1 at 20.)  However, the availability

8  and reasonableness of these alternatives remain in dispute in the instant case.  Assuming that

9  plaintiff submitted a Religious Diet Request Form the day after his arrival at CSP-SOL, he never

10  received a response or a Religious Diet Card; moreover, the Imam informed plaintiff that there

11  was a four-month backlog in processing applications, despite the 30-day limit imposed by the

12  regulations.  Also, it is against plaintiff's religious beliefs and practice to obtain meal trays that

13  include meat, only to remove the meat, and plaintiff avers that he had limited funds to obtain

14  food from the canteen.  Even in Ad Seg, when plaintiff received meal trays that never included

15  meat, he did not receive a protein or meat substitute.  Plaintiff alleges that, as a result, he lost

16  weight, was stressed and could not sleep.

17    Plaintiff persuasively responds, under a <u>Turner</u> analysis, that there were broad,

18  easy and readily available alternatives to the alleged CSP-SOL confiscation policy that

19  defendants seek to defend.  The "existence of obvious, easy alternatives may be evidence that the

20  regulation is not reasonable, but is an 'exaggerated response' to prison concerns," particularly if

21  an alternative can be "implemented at a minimal cost to legitimate penological interests."

22  <u>Turner</u>, 482 U.S. at 90.  Plaintiff suggests that "[a] standard meal card for all CDCR institutions

23  or a policy which allows the use of meal cards issued at one institution to be used at other

24  institutions, provides an 'easy alternative' that is essentially already implemented by the fact that

25  most officers allow inmates to use cards issued by different institutions.  Alternatively, the new

26  institution could contact the transferring institution to verify the legitimacy of the card.  The

1 existence of these alternatives highlights that Officer Carroll's actions were an exaggerated

2 response to the prison's alleged concerns." (Dkt. No. 39 at 17.)  Plaintiff's argument is

3 supported by the 2010 changes to the CDCR regulations, noted supra.

4        Pursuant to these considerations and the weight of the evidence, it is reasonable to

5 infer that CSP-SOL lacked a standard policy and practice in the handling of Religious Diet Cards

6 issued to inmates by other institutions.  Moreover, even if CSP-SOL routinely abided by its

7 asserted policy of confiscating all such cards, the omission of an alternate method by which a

8 newly transferred inmate could maintain his religious diet appears to fall short of the Turner test,

9 particularly in light of the four-month backlog in the CSP-SOL processing Religious Diet Card

10 applications.  However, the court need not, at present, resolve these policy matters, because

11 plaintiff's legal claim rests on his assertion that defendant Carroll was motivated by religious

12 animus and discrimination when he confiscated plaintiff's Old Folsom Religious Diet Card.

13        a.  Defendant Carroll

14        The apparently discretionary application of CSP-SOL's asserted policy of

15 confiscating Religious Diet Cards issued by other institutions, together with defendant Carroll's

16 allegedly discriminatory statements to plaintiff, support a reasonable inference that Carroll acted

17 with discriminatory intent when he confiscated plaintiff's Old Folsom Religious Diet Card.  As

18 an immediate result of the confiscation, plaintiff was denied the ability to observe the dietary

19 laws of his religion and, hence, his First Amendment right to exercise his religion.  However,

20 whether Carroll confiscated plaintiff's Old Folsom Religious Diet Card, whether Carroll made

21 discriminatory comments to plaintiff in the process, and Carroll's subjective intent when

22 allegedly so acting, remain material factual disputes.  Defendant Carroll's asserted lack of

23 recollection of any interaction with plaintiff on January 14, 2007 -- in contrast to plaintiff's

24 detailed recollection, supported by the declaration of percipient witness Willie Pace -- renders a

25 finding as to Carroll's conduct and intent unresolvable on summary judgment.

26 ////

1    Accordingly, defendants' motion for summary judgment on plaintiff's First

2 Amendment claim against defendant Carroll should be denied.

3         b.  Defendant Sisto

4    Plaintiff contends that defendant Sisto, CSP-SOL Warden, expressly ratified

5 defendant Carroll's alleged misconduct, and thereby also violated plaintiff's First Amendment

6 rights.

7         "A defendant may be held liable as a supervisor under § 1983 if there exists either

8 (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal

9 connection between the supervisor's wrongful conduct and the constitutional violation. . . . The

10 requisite causal connection can be established by setting in motion a series of acts by others, or

11 by knowingly refusing to terminate a series of acts by others, which the supervisor knew or

12 reasonably should have known would cause others to inflict a constitutional injury.  A supervisor

13 can be liable in his individual capacity for his own culpable action or inaction in the training,

14 supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation;

15 or for conduct that showed a reckless or callous indifference to the rights of others."  Starr v.

16 Baca, 652 F.3d 1202, 1207-08 (9th Cir. 2011) (citations, and internal alterations, punctuation and

17 quotation marks omitted).

18         Pursuant to his Second Level Review of plaintiff's administrative grievance (Log

19 No. CSP-S-07-00273), defendant Sisto was put on notice that defendant Carroll had confiscated

20 plaintiff's Old Folsom meal card, rendering meat-substitute trays unavailable to plaintiff; and of

21 plaintiff's request, based on his religious beliefs, that he be provided meat-substitute trays

22 pending receipt of an authorized CSP-SOL Religious Diet Card.  As plaintiff now contends,

23 while defendant Sisto directed plaintiff to the pertinent regulations and procedures, he "did not

24 take action to remedy the situation," "affirmatively prolonged the denial of food that met

25 Plaintiff's religious-based diet," and hence "knowingly allowed Plaintiff to be deprived of a

26 religious diet."  (Dkt. No. 39 at 17, 19.)

1          Moreover, as plaintiff contends, defendant Sisto's Second Level response, in light

2    of the additional alleged facts, appears to demonstrate a failure to train and supervise CSP-SOL

3    staff, specifically:  (1) that Sisto failed to ensure that approved Religious Diet Card applications

4    were implemented within 30 days, as required by department regulations; and (2) that Sisto failed

5    to articulate, train, implement or enforce a consistent CSP-SOL policy concerning the

6    confiscation of Religious Diet Cards issued by other institutions, as demonstrated by Sisto's

7    answers to interrogatories, and the deposition testimony of defendant Fowler.  Sisto's alleged

8    inaction on these matters, if true, would indicate that Sisto knew, or reasonably should have

9    known, that CSP-SOL inmates were at risk of constitutional deprivation due to the prolonged

10   Religious Diet Card application process, and the discretionary confiscation of Religious Diet

11   Cards; and that Sisto failed to implement readily available changes at CSP-SOL that would

12   reduce the risk of constitutional deprivation.  Sisto's alleged indifference to these matters is

13   assertedly underscored by his Second Level response to plaintiff, that "[s]ome Muslims eat

14   meat." and "you can eat the meal that is issued to you and eliminate the meat."  (Dkt. No. 39-7 at

15   6.)  Moreover, Sisto's decision to characterize plaintiff's grievance as a "religious program

16   issue," rather than a "citizen's complaint" against defendant Carroll (id. at 8), may connote, at

17   best, indifference to inmate allegations of discriminatory conduct by correctional staff; at worst,

18   official sanction of the alleged misconduct.  These material factual disputes render summary

19   judgment as to defendant Sisto inappropriate at this time.

20          Accordingly, defendants' motion for summary judgment on plaintiff's First

21   Amendment claim against defendant Sisto should be denied.

22          4.  Qualified Immunity

23          Defendants do not challenge clearly established law supporting a prisoner's First

24   Amendment right to be provided food that is both sufficient to sustain health and satisfies the

25   dietary beliefs and practices of his religion.  See McElyea v. Babbitt, supra, 833 F.2d at 198.

26   Rather, defendants contend that they did not participate in the acts that allegedly resulted in

1   plaintiff's deprivation of this right.  Qualified immunity does not apply where disputed facts,

2   construed in the light most favorable to the party asserting the injury, show a violation of a

3   clearly established constitutional right of which a reasonable official should be aware.  Anderson

4   v. Creighton, supra, 483 U.S. at 640.  Therefore, neither defendant Carroll nor Sisto are entitled

5   to qualified immunity on plaintiff's First Amendment Free Exercise claim.

6           B.  Fourteenth Amendment Right to Equal Protection

7           Plaintiff relies on the same allegations relative to defendant Carroll's alleged

8   confiscation of plaintiff's Old Folsom Religious Diet Card, and Carroll's alleged

9   contemporaneous statements, as well as defendant Sisto's alleged ratification of Carroll's alleged

10   misconduct, to assert a denial of his right to equal protection.  Defendants move for summary

11   judgment on this claim on the ground that "there is no evidence that they violated the plaintiff's

12   right to equal protection of the laws under the Fourteenth Amendment," and that "[p]laintiff was

13   not in any way being singled out for unequal treatment."  (Dkt. No. 33-1 at 21.)

14           1. Legal Standards

15           Prisoners are protected from intentional discrimination on the basis of their

16   religion by the Fourteenth Amendment's Equal Protection Clause.  Freeman v. Arpaio, 125 F.3d

17   732, 737 (9th Cir. 1997) (citing Cruz v. Beto, 405 U.S. 319, 321-22 (1972) (per curiam),

18   abrogated on other grounds by Shakur v. Schriro, supra, 514 F.3d at 884-85.  The Equal

19   Protection Clause "requires the State to treat all similarly situated people equally.  Moreover, the

20   Equal Protection Clause entitles each prisoner to 'a reasonable opportunity of pursuing his faith

21   comparable to the opportunity afforded fellow prisoners who adhere to conventional religious

22   precepts.'"  Shakur, 514 F.3d at 891 (citation omitted), quoting Cruz, supra, 405 U.S. at 322.

23   To establish a violation of the Equal Protection Clause, "a plaintiff in a section 1983 claim must

24   show that officials intentionally acted in a discriminatory manner."  Freeman, 125 F.3d at 737

25   (citations omitted).  "Intentional discrimination means that a defendant acted at least in part

26   because of a plaintiff's protected status.  To avoid summary judgment, [a plaintiff] must produce

1  evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the

2  evidence" that the challenged conduct was motivated by discriminatory intent.  Serrano v.

3  Francis, 345 F.3d 1071, 1082 (9th Cir. 2003) (citation and internal quotation marks omitted).

4  The Turner test described above applies to Equal Protection claims arising out of prison, with an

5  emphasis on the question whether the alleged difference in official treatment alleged was

6  reasonably related to legitimate penological interests.  Shakur, 514 F.3d at 891 (citations and

7  quotation marks omitted).

8          2.  Analysis

9              a.  Defendant Carroll

10         There remain material factual disputes concerning defendant Carroll's alleged

11 confiscation of plaintiff's Old Folsom Religious Diet Card on January 14, 2007, and Carroll's

12 allegedly contemporaneous and discriminatory statements to plaintiff.  Plaintiff's corroborated

13 recollection is that Carroll made offensive and discriminatory statements about Muslims, the

14 Muslim faith, and plaintiff's efforts to obtain meals consistent with his Islamic beliefs; however,

15 Carroll states that he has no recollection of this alleged event, or of any other relevant interaction

16 with plaintiff.  Therefore, the court must, for purposes of this motion, find that plaintiff has

17 shown by a preponderance of evidence that Carroll's confiscation of plaintiff's Religious Diet

18 Card was motivated by discriminatory intent, rather than a legitimate penological purpose, thus

19 precluding summary judgment on this claim.

20         Accordingly, defendants' motion for summary judgment on plaintiff's Fourteenth

21 Amendment Equal Protection claim against defendant Carroll should be denied.

22             b.  Defendant Sisto

23         Defendant Sisto's alleged ratification of Carroll's alleged misconduct was

24 premised on CSP-SOL's asserted policy of routinely confiscating Religious Diet Cards issued by

25 other institutions.  Sisto expressly declined to consider plaintiff's allegations against defendant

26 Carroll, finding that plaintiff's grievance was solely a "religious program issue."  (Dkt. No. 39-7

at 8.)  However, there remain material factual disputes whether CSP-SOL's asserted policy of confiscating all religious diet cards from other institutions was uniformly enforced, and whether the confiscation of plaintiff's Old Folsom Religious Diet Card was motivated by defendant Carroll's animus toward Muslims.  The court is therefore unable to determine on summary judgment whether defendant Sisto may have acquiesced in, and/or ratified, Carroll's allegedly discriminatory conduct.  As discussed above, the available facts support a reasonable inference that Sisto was fully informed of the alleged relevant facts, and that Sisto was in a position to intervene on plaintiff's behalf, to censure Carroll, and/or to more clearly articulate and enforce a consistent and nondiscriminatory policy at CSP-SOL concerning the confiscation of Religious Diet Cards issued by other institutions.  The available record indicates that Sisto did not pursue any of these options.

For these reasons, defendants' motion for summary judgment on plaintiff's Fourteenth Amendment Equal Protection claim against defendant Sisto should be denied.

3.  Qualified Immunity

Defendants do not challenge clearly established law supporting a prisoner's Fourteenth Amendment right to equal protection in the pursuit of his faith.  See Shakur v. Schriro, supra, 514 F.3d at 89; Cruz v. Beto, supra, 405 U.S. at 322.  Rather, defendants contend that they did not participate in the acts that allegedly resulted in plaintiff's deprivation of this right.  As earlier noted, qualified immunity does not apply where disputed facts, construed in the light most favorable to the party asserting the injury, show a violation of a clearly established constitutional right of which a reasonable official should be aware.  Anderson v. Creighton, supra, 483 U.S. at 640.  Therefore, neither defendant Carroll nor Sisto are entitled to qualified immunity on plaintiff's Fourteenth Amendment Equal Protection claim.

C.  Eighth Amendment Sexual Harassment Claim

Defendants move for summary judgment on plaintiff's claim that defendant J. Johnson sexually harassed plaintiff in violation of the Eighth Amendment.

1        1. <u>Legal Standards</u>

2        "The Eighth Amendment, in only three words, imposes the constitutional

3  limitation upon punishments:  they cannot be 'cruel and unusual.'  The Court has interpreted

4  these words in a flexible and dynamic manner, and has extended the Amendment's reach beyond

5  the barbarous physical punishments at issue in the Court's earliest cases." <u>Rhodes v. Chapman</u>,

6  452 U.S. 337, 345 (1981) (citations and internal quotation marks omitted).  "Whether a particular

7  event or condition in fact constitutes 'cruel and unusual punishment' is gauged against 'the

8  evolving standards of decency that mark the progress of a maturing society.'" <u>Schwenk v.</u>

9  <u>Hartford</u>, <u>supra</u>, 204 F.3d at 1196, quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992) (citations

10 and quotation marks omitted).  A viable Eighth Amendment prison claim requires proof of both

11 an "objective component" ("[w]as the deprivation sufficiently serious?"), and a "subjective

12 component" ("[d]id the official[] act with a sufficiently culpable state of mind?").  <u>Wilson v.</u>

13 <u>Seiter</u>, 501 U.S. 294, 298 (1991).

14       Physical sexual assault by a prison official on an inmate is deeply offensive to

15 human dignity, lacks any legitimate penological objective, and therefore violates the Eighth

16 Amendment.  <u>Schwenk</u>, 204 F.3d at 1196-97; <u>accord</u> <u>Boddie v. Schnieder</u>, 105 F.3d 857, 861 (2d

17 Cir.1997) ("sexual abuse of a prisoner by a corrections officer has no legitimate penological

18 purpose, and is 'simply not part of the penalty that criminal offenders pay for their offenses

19 against society,'" quoting <u>Farmer v. Brennan</u>, <u>supra</u>, 511 U.S. at 834.  Thus, a claim of physical

20 sexual assault by a prison official against an inmate will almost always survive summary

21 judgment.  <u>See</u> <u>e.g.</u> <u>Women Prisoners of the Dist. of Columbia Dept. of Corrections</u>, 877 F.

22 Supp. 634, 665 (D.D. Cir. 1994) ("Rape, coerced sodomy, unsolicited touching of women

23 prisoners' vaginas, breasts and buttocks by prison employees are 'simply not part of the penalty

24 that criminal offenders pay for their offenses against society'" (quoting <u>Farmer</u>, 511 U.S. at

25 834)), <u>aff'd in part and vacated in part</u>, 93 F.3d 910 (D.C. Cir. 1996); <u>Mathie v. Fries</u>, 935

26 F.Supp. 1284, 1301 (E.D.N.Y. 1996) (denying qualified immunity to director of prison security

1   because "any reasonable prison Director of Security knew that to try to force unwanted and

2   prohibited sexual acts on a powerless inmate is objectively unreasonable and in violation of the

3   inmates rights").

4          However, inmate sexual harassment claims, which allege sexually inappropriate

5   touching and/or sexually inappropriate comments, require a careful assessment of the unique

6   circumstances of each case.[12]  Claims premised only on alleged verbal sexual harassment are

7   generally found to be noncognizable.  "Although the Ninth Circuit has recognized that sexual

8   harassment may constitute a cognizable claim for an Eighth Amendment violation, the Court has

9   specifically differentiated between sexual harassment that involves verbal abuse and that which

10   involves allegations of physical assault, finding [only] the later to be in violation of the

11   constitution."  Minifield v. Butikofer, 298 F. Supp. 2d 900, 904 (N.D. Cal. 2004), citing

12   Schwenk, supra, 204 F.3d at 1198.  "[T]he Eighth Amendment's protections do not necessarily

13   extend to mere verbal sexual harassment."  Austin v. Terhune, 367 F.3d 1167, 1172 (9th Cir.

14   2004), citing Blueford v. Prunty, 108 F.3d 251, 254-55 (9th Cir. 1997) (prison guard who

15   allegedly engaged in "vulgar same-sex trash talk" with inmates entitled to qualified immunity);

16   and Somers v. Thurman, 109 F.3d 614, 624 (9th Cir. 1997) (female correctional officers who

17   allegedly made improper statements about plaintiff while he showered entitled to qualified

18   immunity).

19   ////

20

21        [12]  The term "sexual harassment" is inherently ambiguous.  However, CDCR regulations
define "sexual misconduct" by a correctional employee as "any sexual behavior by a

22   departmental employee . . . which involves or is directed toward an inmate or parolee.  The legal
concept of 'consent' does not exist between departmental staff and inmates/parolee; any sexual

23   behavior between them constitutes sexual misconduct."  15 C.C.R. § 3401.5(a).  These
regulations include, as sexual misconduct, any "[r]ubbing or touching of the breasts or sexual

24   organs of another or of oneself, in the presence of and with knowledge of another, for the
purpose of sexual arousal, gratification, or manipulation;" and any "[i]nvasion of privacy, beyond

25   that reasonably necessary to maintain safety and security; or disrespectful, unduly familiar, or
sexually threatening comments directed to, or within the hearing of, an inmate/parolee."  Id., §

26   3401.5(a)(3)(E), (F).

1        Similarly, claims alleging sexually inappropriate conduct that does not include

2   touching have generally been found to be noncognizable under the Eighth Amendment.  In

3   Austin v. Terhune, supra, 367 F.3d 1167, the Ninth Circuit upheld dismissal of an Eighth

4   Amendment claim premised on allegations that defendant correctional officer Williams, "[w]hile

5   still in the control booth, which had a large glass window, . . . allegedly unzipped his pants,

6   exposed his penis to Austin, who is black, and said 'come suck this white dick, boy,' while

7   shaking his exposed penis at Austin."  Id. at 1169.  The Ninth Circuit ruled that "the district court

8   properly concluded that this incident was not sufficiently serious to constitute an Eighth

9   Amendment violation," because "Williams was in an elevated, glass-enclosed control booth

10  when he exposed himself to Austin and this isolated incident lasted for a period of no more than

11  30-40 seconds [and] Williams never physically touched Austin."  Id. at 1171-72; accord Somers

12  v. Thurman, supra, 109 F.3d at 624 ("[t]o hold that gawking, pointing, and joking violates the

13  prohibition against cruel and unusual punishment would trivialize the objective component of the

14  Eighth Amendment test and render it absurd"); see also Jonas v. Idaho, 2006 WL 3197158, *3

15  (D. Idaho 2006) (physician's allegedly obscene gesture during inmate's medical appointment

16  found analogous to harassment found insufficient to state an Eighth Amendment claim in Austin,

17  supra, 367 F.3d 1167).

18        Inmate sexual harassment claims that allege brief inappropriate touching by a

19  correctional official are generally found to be noncognizable, particularly if the alleged touching

20  occurred pursuant to an authorized search.  "Even if plaintiff believed that there was a sexual

21  aspect to the search, more is needed."  Smith v. Los Angeles County, 2010 WL 2569232, *5

22  (C.D. Cal. 2010); adopted by 2010 WL 2572570 (C.D. Cal.  2010); aff'd, 452 Fed. Appx. 768

23  (9th Cir. 2011) (pretrial detainee failed to state Fourteenth Amendment due process claim, or

24  Fourth Amendment unreasonable search claim, based on plaintiff's allegations that defendant

25  correctional officer, pursuant to a search and without sexual comment, pulled plaintiff's boxers

26  to look at his buttocks, inserted his hand "karate chop" style, into "the cavity of my buttocks . . .

1    until it passed between my legs and reached under and around until he cupped by genitals," id. at

2    *4); citing Berryhill v. Schriro, 137 F.3d 1073, 1076 (8th Cir. 1998) (affirming summary

3    judgment for defendant on plaintiff's Eighth Amendment claim that prison employee's brief

4    touch ("mere seconds") to plaintiff's buttocks during "horseplay," unaccompanied by sexual

5    comments, was an improper sexual advance that "embarrassed" plaintiff ); and Osterloth v.

6    Hopwood, 2006 WL 3337505, *6, *7 (D. Mont. 2006) (dismissing Eighth Amendment claim

7    challenging as sexually abusive an officer's search of plaintiff that allegedly included the officer

8    reaching between plaintiff's legs, grabbing his scrotum and penis, and sliding his hand between

9    plaintiff's buttocks, wherein plaintiff stated to the officer, "that was pretty much sexual assault,"

10   and officer responded, "yah pretty much.").

11        More recently, in Watison v. Carter, 668 F.3d 1108, 1112-14 (9th Cir., Feb. 13,

12   2012), the Ninth Circuit affirmed the dismissal of an inmate's Eighth Amendment sexual

13   harassment claim against a correctional officer who allegedly entered plaintiff's cell while

14   plaintiff was on the toilet, rubbed his thigh against plaintiff's thigh and "began smiling in a

15   sexual contact (sic)," then left plaintiff's cell laughing.  The Ninth Circuit ruled that "[t]he

16   'humiliation' Watison allegedly suffered from the incident with Officer LaGier does not rise to

17   the level of severe psychological pain required to state an Eighth Amendment claim." Id. at

18   1113.  Moreover, the Ninth Circuit found that "Officer LaGier's alleged wrongdoing was not

19   objectively harmful enough to establish a constitutional violation. . . ." Id. at 1114 (citations and

20   internal quotation marks omitted).

21        2. Analysis

22        The court must first consider, while viewing the alleged facts in the light most

23   favorable to plaintiff, whether plaintiff's alleged harm was objectively "sufficiently serious."  "A

24   prisoner may state an Eighth Amendment claim under § 1983 for sexual harassment only if the

25   alleged harassment was sufficiently harmful." Minifield, 298 F. Supp. 2d at 903 (citations

26   omitted).

1          In his relevant administrative grievance, plaintiff alleged that being required to

2   repeat the "squat and cough" procedure "demean[ed] and degrade[d] me," and "when I notice[d]

3   the bulge in c/o J. Johnson['s] pants his conduct exceeded beyond demeaning and degrading, but

4   reached a level of perversion and molestation to the degree that I felt violated extremely." (Dkt.

5   No. 14 at 17 (Log No. CSP-S-07-02026).)  Plaintiff repeated these sentiments a few days later, in

6   a letter to the Internal Affairs Office, in which he expressed dismay at the affront to "the integrity

7   of my manhood." (Dkt. No. 14 at 22.)  At his deposition, plaintiff stated that defendant J.

8   Johnson's alleged conduct made plaintiff feel "annoyed and offended." (Pltf. Depo. at 82:19-20.)

9          This court finds that plaintiff's alleged psychological injury resulting from

10  defendant J. Johnson's subject search of plaintiff was, objectively, not sufficiently serious to

11  support an Eighth Amendment claim.  Feeling "demeaned," "degraded," "annoyed" and

12  "offended" "does not rise to the level of severe psychological pain required to state an Eighth

13  Amendment claim." Watison, 668 F.3d at 1113.

14         Even if plaintiff's alleged injury was sufficiently serious to state an Eighth

15  Amendment claim, the court finds that the evidence fails to support a reasonable inference that

16  defendant J. Johnson acted with a sufficiently culpable state of mind.  Defendant J. Johnson's

17  orders that plaintiff repeat, for a total of three times, the "squat and cough" portion of the subject

18  search, and defendant's alleged use of a flashlight during the search, were authorized procedures

19  within the scope of defendant's official responsibilities.  Plaintiff does not dispute that legitimate

20  penological objectives support routine strip searches of prisoners after they leave a visiting room,

21  including the "squat and cough" procedure, and the use of a flashlight for illumination.[13]  Thus,

22  the scope and manner of the challenged search, as well as the location and timing of the search,

23  were within authorized limits.  Cf. Bell v. Wolfish, 441 U.S. 520, 558-59 (1979) (visual cavity

24

25          [13]  While courts have long recognized the affront to human dignity rendered by strip
     searches, see e.g. Byrd v. Maricopa County Sheriff's Department, 629 F.3d 1135 (9th Cir. 2011),
26   and cases cited therein, more is required to state an Eighth Amendment claim.

1   searches of pretrial detainees after contact visits held reasonable under the Fourth Amendment,

2   based upon a consideration of "the scope of the particular intrusion, the manner in which it is

3   conducted, the justification for initiating it, and the place in which it is conducted").

4           The court further finds that plaintiff's allegation that defendant J. Johnson

5   prolonged his search of plaintiff for his own sexual gratification, as allegedly demonstrated by J.

6   Johnson's alleged erection, does not present a material factual dispute.  Defendant J. Johnson's

7   denial that he was sexually aroused by his search of plaintiff (see J. Johnson Depo. 37:1-40:25; J.

8   Johnson Answ. to Amd. Interr. Nos. 3-5), and plaintiff's concession that his assessment was

9   necessarily speculative (see Pltf. Depo. 42:21), demonstrate that the matter presents an inherently

10  unresolvable factual dispute.  Even if true, no other alleged facts suggest that defendant acted

11  with a culpable state of mind.  Defendant did not touch plaintiff during the search; nor did

12  defendant make any comments that could reasonably be construed as sexually provocative.

13  Despite requiring plaintiff to repeat the "cough and squat" procedure, defendant's authorized

14  extended search of plaintiff was an isolated incident of relatively short duration.  These factors

15  demonstrate that defendant J. Johnson's challenged conduct was "not objectively harmful enough

16  to establish a constitutional violation."  Watison, 668 F.3d at 1114 (citations and internal

17  quotation marks omitted).  Accordingly, the court finds that the evidence of record demonstrates

18  that defendant J. Johnson's search of plaintiff on February 11, 2007, did not violate the Eighth

19  Amendment.

20          For these reasons, defendants' motion for summary judgment on plaintiff's Eighth

21  Amendment sexual harassment claim against defendant J. Johnson should be granted.

22                  3. Qualified Immunity

23          The court need not reach defendants' contention that defendant J. Johnson is

24  entitled to qualified immunity for his search of plaintiff on February 11, 2007.  Where the alleged

25  facts do not state a claim for violation of an established constitutional right, the court need make

26  no further inquiry under a qualified immunity analysis.  Saucier v. Katz, supra, 533 U.S. at 201.

1      D.  Eighth Amendment Excessive Force Claim

2      Defendants move for summary judgment on plaintiff's Eighth Amendment claim

3 that defendant Fowler subjected plaintiff to excessive force.

4      1.  Legal Standards

5      "[W]henever prison officials stand accused of using excessive physical force in

6 violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in

7 Whitley:  whether force was applied in a good-faith effort to maintain or restore discipline, or

8 maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), citing

9 Whitley v. Albers, 475 U.S. 312 (1986).  "When prison officials maliciously and sadistically use

10 force to cause harm, contemporary standards of decency always are violated.  This is true

11 whether or not significant injury is evident." Hudson, 503 U.S. at 9, citing Whitley, 475 U.S. at

12 327.  Excessive force claims must be evaluated "based on the nature of the force rather than the

13 extent of the injury." Wilkins v. Gaddy, 130 S. Ct. 1175, 1176 (2010) (per curiam).  While

14 "[t]he extent of injury may . . . provide some indication of the amount of force applied [,] . . .

15 [i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts."

16 Id. at 1178.  "An inmate who is gratuitously beaten by guards does not lose his ability to pursue

17 an excessive force claim merely because he has the good fortune to escape without serious

18 injury." Id. at 1178-79.  On the other hand, "[a]n inmate who complains of a 'push or shove' that

19 causes no discernible injury almost certainly fails to state a valid excessive force claim." Id. at

20 1178 (citations omitted).  In assessing whether force was legally excessive, the court should

21 consider, in addition to the extent of injury suffered by the inmate, "the need for application of

22 force, the relationship between that need and the amount of force used, the threat reasonably

23 perceived by the responsible officials, and any efforts made to temper the severity of a forceful

24 response." Hudson, 503 U.S. at 7, citing Whitley, 475 U.S. at 321 (internal quotations omitted).

25      2.  Analysis

26      Because defendant Fowler has no recollection of the alleged events, the court

must assume the truth of plaintiff's factual allegations for purposes of the instant motion.
Plaintiff alleges that, on February 11, 2007, while two other correctional officers pinned plaintiff
against a wall, defendant Fowler bumped plaintiff's chest with his own chest and spit in
plaintiff's face, apparently inadvertently, while taunting plaintiff to fight, insulting plaintiff, and
threatening to send plaintiff to Ad Seg and ensure a parole denial.  Although plaintiff concedes
that he was not physically injured by Fowler, and that no fight ensued, he alleges that Fowler's
use of force was entirely gratuitous and malicious, without any legitimate penological need; that
the incident made plaintiff feel degraded and threatened, feelings that persisted in the ensuing
weeks when plaintiff encountered Fowler in the yard; and that plaintiff's feelings were validated
by Fowler ultimately following through on his threat to place plaintiff in Ad Seg and ensure a
parole denial.

Plaintiff's allegations support a reasonable inference that defendant Fowler may
have been motivated by anger due to plaintiff's interaction with defendant J. Johnson, rather than
a need to restore discipline or maintain order.  Nevertheless, Fowler's alleged bumping of
plaintiff, and spitting in plaintiff's face, even if intentional, were uses of force that, while
inappropriate, fall short of being constitutionally excessive.  "The Eighth Amendment's
prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional
recognition de minimis uses of physical force, provided that the use of force is not of a sort
repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9 (citations and internal quotation
marks omitted); quoted with approval in Wilkins, 130 S. Ct. at 1178.  Plaintiff's concessions that
Fowler did not beat him, no fight ensued, and plaintiff suffered no physical injury, support a
finding that defendant Fowler's alleged use of force was de minimis.  As the Supreme Court has
repeatedly recognized, "not 'every malevolent touch by a prison guard gives rise to a federal
cause of action.'"  Wilkins, 130 S. Ct. at 1178, quoting Hudson, 503 U.S. at 9.  Under these
circumstances, the court finds that plaintiff's alleged emotional harm, without any physical harm,
resulting from defendant Fowler's minimal alleged excessive force, was constitutionally

1    insignificant under the Eighth Amendment's Cruel and Unusual Punishment Clause.

2          For these reasons, defendants' motion for summary judgment on plaintiff's Eighth

3    Amendment excessive force claim against defendant Fowler should be granted.

4          3.  Qualified Immunity

5          The court need not reach defendants' contention that defendant Fowler is entitled

6    to qualified immunity for his alleged excessive force against plaintiff on February 11, 2007.

7    Where the alleged facts do not state a claim for violation of an established constitutional right,

8    the court need make no further inquiry under a qualified immunity analysis.  Saucier v. Katz,

9    supra, 533 U.S. at 201.

10         E.  First Amendment Retaliation Claims

11         Defendants move for summary judgment on plaintiff's claims that defendants J.

12   Johnson, Fowler, Jackura, San Nicholas, and Kesterson, as well as defendant Cervantes,

13   retaliated against plaintiff for exercising his recognized First Amendment right to file

14   administrative grievances, and his alleged First Amendment right to verbally challenge

15   correctional staff.

16         1.  Retaliation Claim Premised on Plaintiff's Statements to Defendant J. Johnson

17         Defendants move for summary judgment on plaintiff's claim that defendants J.

18   Johnson and Fowler retaliated against plaintiff for the statements plaintiff made incident to his

19   February 11, 2007 search, demonstrated by J. Johnson handcuffing and restraining plaintiff, then

20   escorting plaintiff to center complex where J. Johnson and Fowler allegedly sought to verbally

21   and physically intimidate plaintiff.  Plaintiff contends that his "verbal complaints and challenges

22   to the excessive and harassing strip searches performed by Officer Johnson was protected

23   speech" (Dkt. No. 39 at 29) and, therefore, that defendants' immediate responses thereafter are

24   actionable under a First Amendment retaliation claim.[14]  For the reasons set forth below, the

25   ─────────────────────

26         [14]  As set forth in his opposition to the motion for summary judgment, plaintiff explains
     (Dkt. No. 39 at 29):

1    court finds that plaintiff's statements were not protected speech.

2             a. <u>Legal Standards</u>

3             To state a claim for retaliation under the First Amendment, a prisoner must allege

4 that a state actor took an adverse action against him, in retaliation for plaintiff engaging in an

5 activity protected by the First Amendment, and that the adverse action did not reasonably

6 advance a legitimate penological objective. <u>Rhodes v. Robinson</u>, 408 F.3d 559, 567-68 (9th Cir.

7 2005); <u>Rizzo v. Dawson</u>, 778 F.2d 527, 531-32 (9th Cir. 1985). In addition, the alleged adverse

8 action must be of the type to chill or silence a person of ordinary firmness, or must have caused

9 plaintiff direct and tangible harm. <u>Rhodes</u>, 408 F.3d at 568 n.11 and related text; <u>Brodheim v.</u>

10 <u>Cry</u>, 584 F.3d 1262, 1269 (9th Cir. 2009).

11             Plaintiff cites no authority in support of his contention that prisoners have a

12 protected First Amendment right to verbally challenge correctional staff. The only First

13 Amendment "protected speech" cases cited by plaintiff -- which recognize the rights of citizens

14 to verbally challenge police action, <u>see</u> <u>City of Houston, Texas v. Hill</u>, 482 U.S. 451, 462-63

15 (1987), and to direct obscene words and gestures to police officers, <u>see</u> <u>Duran v. City of Douglas</u>,

16 904 F.2d 1372, 1378 (9th Cir. 1990) -- do not involve prisoners.

17             The consensus of the cases that have considered the issue  appears to be that an

18 inmate's verbal challenges or rantings to correctional staff are not within the ambit of First

19 Amendment protection, <u>see e.g.</u> <u>Young v. Moreno</u>, 2012 WL 1836088, *4 (C.D. Cal., May 08,

20 2012) (prisoner's verbal confrontation with correctional officer, which included plaintiff's

21 statement that the officer was "stupid to write such bullshit RVR's," not protected speech), and

22 ────────────────────

23          Plaintiff challenged Officer Johnson's conduct by asking why he
had to perform the search again. (Plain. Dep. 40-41: 32-8.)  At one

24 point Plaintiff asked, "what kind of shit is this?"  (Plain. Decl.
4:14) and "[w]hat kind of man are you?"  (Plain. Decl. 4:15.)

25 When Johnson replied, "I am a man doing my job." (Plain. Decl.
4:15)  Plaintiff stated, "you have a punk ass job." (Plain. Decl.

26 4:15.)  These types of verbal challenges to Officer's Johnson's
illegal search warrant First Amendment protection.

cases cited therein;[15] <u>Nunez v. Ramirez</u>,  2010 WL 1222058, *4 (S.D. Cal. 2010) (rejecting

plaintiff's contention that "directly [verbally] confronting a correctional officer who was

attempting to enforce an indisputably valid prohibition" was protected speech, because "[s]uch a

direct, face-to-face confrontation presents a danger of a disturbance and a disruption to

institutional order and discipline that a written grievance does not"), while similar written

challenges may be protected, particularly if set forth in a formal grievance, <u>see</u> <u>e.g.</u> <u>Bradley v.</u>

<u>Hall</u>, 64 F.3d 1276 (9th Cir. 1995) (disrespectful language in prison grievance constitutes

protected speech notwithstanding Oregon prison regulation rule proscribing such language),

overruled on other grounds by <u>Shaw v. Murphy</u>, 532 U.S. 223, 230 n.2 (2001); <u>cf.</u> <u>Smith v.</u>

<u>Mosley</u>, 532 F. 3d 1270, 1276 (11th Cir. 2008) (plaintiff's false and insubordinate written

complaints not protected speech, although the grievances containing those complaints were

protected); <u>Roberts v. Jones</u>, 2012 WL 1072218, *2 (W.D. Okla., Feb. 29, 2012) (rejecting on

qualified immunity grounds plaintiff's claims that his free speech was chilled by departmental

policies that placed restrictions on the grievance process and prohibited prisoners from being

---

[15]  The court in <u>Young</u> reasoned as follows, noting the following similar cases:

Plaintiff's statement to Defendant Moreno does not constitute protected First
Amendment conduct; it appears to have been merely a put-down and not an
attempt to assert a prison grievance, as contemplated by the authorities above.
<u>See</u> <u>Lockett v. Suardini</u>, 526 F.3d 866, 874 (6th Cir. 2008) (prisoner's act of
calling hearing officer a "foul and corrupted bitch" not protected speech); <u>Smith v.</u>
<u>Mosley</u>, 532 F.3d 1270, 1277 (11th Cir. 2008) (prisoner's "false and
insubordinate remarks" not protected speech); <u>Garrido v. Coughlin</u>, 716 F. Supp.
98, 99–101 (S.D.N.Y. 1989) ("verbal confrontation" of officers over their
treatment of another inmate not protected conduct); <u>Franklin v. State of Oregon</u>,
563 F. Supp. 1310, 1326 (D. Or. 1983) (First Amendment does not extend to "use
of expletives" directed toward a guard), <u>aff'd in part and rev'd in part</u>, 795 F.2d
1221 (9th Cir. 1984); <u>Riggs v. Miller</u>, 480 F. Supp. 799, 804 (E.D. Va. 1979)
("bickering, argumentative conversation" does not rise to the "lofty position of
constitutionally protected speech"); <u>Durkin v.. Taylor</u>, 444 F. Supp. 879, 881–83
(E.D. Va. 1977) (statement that "I am tired of chickenshit rules" not protected
speech)).

<u>Young v. Moreno</u>, 2012 WL 1836088 at *4 n.6.

1    disrespectful, or making threats, to staff), and cases cited therein.[16]

2              b. Analysis

3         Plaintiff's verbal statements to defendant J. Johnson on February 11, 2007,

4    incident to the challenged search, were of the type found by other courts to be outside the

5    protection of the First Amendment.  The statements were argumentative, confrontational, and

6    disrespectful.  Moreover, as set forth in plaintiff's declaration and deposition testimony, his

7    statements were laced with expletives, and plaintiff continued to express himself in this manner

8    when taken to center complex.  Such verbal insubordination by prisoners is proscribed by the

9    legitimate goal of maintaining order and discipline within correctional institutions, as set forth in

10   the CDCR regulations prohibiting such conduct.[17]  Plaintiff's protected First Amendment

11   recourse for challenging J. Johnson's search, and the ensuing incident involving defendants J.

12

13        [16]  The court in Roberts noted the following similar cases:

14        . . . Lockett v. Suardini, 526 F.3d 866, 874 (6th Cir. 2008) (concluding that an
          inmate's comment in a grievance, calling a prison employee a "foul and corrupted
15        bitch," did not constitute protected speech); Hale v. Scott, 371 F.3d 917, 919 (7th
          Cir. 2004) (rejecting an inmate's free speech claim based on discipline for
16        disrespect to a prison staff member because "[p]rison regulations that forbid
          inmates to behave insolently toward guards are constitutional"); Huff v. Mahon,
17        312 Fed. Appx. 530, 531–32 (4th Cir. Feb. 24, 2009) (unpublished op.) (holding
          that "[a]n inmate does not have a First Amendment right to direct disrespectful
18        comments to a prison official, whether verbally or in writing"); Aziz v. Schriro, 6
          Fed. Appx. 565 (8th Cir. June 5, 2001) (unpublished op.; per curiam) (affirming
19        the dismissal of an inmate's claim that his speech had been chilled through
          discipline for language used in a grievance).

20   Roberts v. Jones, 2012 WL 1072218 at *2 n.6.

21        [17]  .  See e.g. 15 C.C.R. § 3004(a) ("Inmates and parolees have the right to be treated
          respectfully, impartially, and fairly by all employees. Inmates and parolees have the responsibility
22   to treat others in the same manner.:); id.,§ 3004(b) ("Inmates, parolees and employees will not
     openly display disrespect or contempt for others in any manner intended to or reasonably likely to
23   disrupt orderly operations within the institutions or to incite or provoke violence."); id.,§ 3005(a)
     ("Inmates and parolees shall obey all laws, regulations, and local procedures, and refrain from
24   behavior which might lead to violence or disorder, or otherwise endangers facility, outside
     community or another person."); id.,§ 3005(b) ("Inmates and parolees must promptly and
25   courteously obey written and verbal orders and instructions from department staff, and from
     employees of other agencies with authorized responsibility for the custody and supervision of
26   inmates and parolees.")

1    Johnson and Fowler, was to file an administrative grievance.

2          For these reasons, the court finds that plaintiff's statements to defendant J.

3    Johnson on February 11, 2007, incident to the subject search, were not protected speech.

4    Therefore, plaintiff fails to state a First Amendment retaliation claim against defendants J.

5    Johnson or Fowler based on the conduct that allegedly occurred immediately after the search.

6          2.  Retaliation Claim Premised on Plaintiff's Filing of Administrative Grievances

7          Defendants move for summary judgment on plaintiff's claim that defendants J.

8    Johnson, Fowler, Jackura, San Nicholas and Kesterson, as well as defendant Cervantes, retaliated

9    against plaintiff for the exercise of his First Amendment right to file administrative grievances.

10          a.  Legal Standards

11          It is well established that prisoners have a First Amendment right to file prison

12    administrative grievances.  Bruce v. Ylst, 351 F.3d 1283, 1288 (9th Cir. 2003).  This right is

13    premised on the more fundamental right of a prisoner to have meaningful access to the courts.

14    Bounds v. Smith, 430 U.S. 817, 828 (1977).  The Ninth Circuit recently summarized the

15    requirements for stating a cognizable First Amendment retaliation claim premised on a inmate's

16    filing of an administrative grievance:

17          Prisoners have a First Amendment right to file grievances against
          prison officials and to be free from retaliation for doing so.
18          Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009).  A
          retaliation claim has five elements.  Id.  First, the plaintiff must
19          allege that the retaliated-against conduct is protected.  The filing of
          an inmate grievance is protected conduct.  Rhodes v. Robinson,
20          408 F.3d 559, 568 (9th Cir. 2005).  Second, the plaintiff must
          claim the defendant took adverse action against the plaintiff.  Id. at
21          567.  The adverse action need not be an independent constitutional
          violation.  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).
22          "[T]he mere threat of harm can be an adverse action...." Brodheim,
          584 F.3d at 1270.

23
          Third, the plaintiff must allege a causal connection between the
24          adverse action and the protected conduct.  Because direct evidence
          of retaliatory intent rarely can be pleaded in a complaint, allegation
25          of a chronology of events from which retaliation can be inferred is
          sufficient to survive dismissal.  See Pratt, 65 F.3d at 808 ("timing
26          can properly be considered as circumstantial evidence of retaliatory

1    intent"); Murphy v. Lane, 833 F.2d 106, 108–09 (7th Cir. 1987).

2    Fourth, the plaintiff must allege that the "official's acts would chill
     or silence a person of ordinary firmness from future First
3    Amendment activities." Robinson, 408 F.3d at 568 (internal
     quotation marks and emphasis omitted). "[A] plaintiff who fails to
4    allege a chilling effect may still state a claim if he alleges he
     suffered some other harm," Brodheim, 584 F.3d at 1269, that is
5    "more than minimal," Robinson, 408 F.3d at 568 n.11. That the
     retaliatory conduct did not chill the plaintiff from suing the alleged
6    retaliator does not defeat the retaliation claim at the motion to
     dismiss stage. Id. at 569.

7
     Fifth, the plaintiff must allege "that the prison authorities'
8    retaliatory action did not advance legitimate goals of the
     correctional institution...." Rizzo v. Dawson, 778 F.2d 527, 532
9    (9th Cir. 1985). A plaintiff successfully pleads this element by
     alleging, in addition to a retaliatory motive, that the defendant's
10   actions were arbitrary and capricious, id., or that they were
     "unnecessary to the maintenance of order in the institution,"
11   Franklin v. Murphy, 745 F.2d 1221, 1230 (9th Cir. 1984).

12   Watison v. Carter, supra, 668 F.3d at 1114-15.

13        b. Analysis

14        On February 14, 2007, three days after the alleged events involving defendants J.

15   Johnson and Fowler, plaintiff filed an administrative grievance challenging defendant J.

16   Johnson's search of plaintiff, and defendants' ensuing alleged "threats, harassment, robbery, and

17   . . . retaliatory tactics," asserting that defendant J. Johnson's alleged "sexual deviant misconduct .

18   . . escalated into vindictive, capricious retaliatory actions and criminal behavior" by J. Johnson

19   and other correctional officers.[18]  (Dkt. No. 14 at 17 (Log No. CSP-S-02026).)  On April 26,

20   2007, plaintiff was placed in Ad Seg pursuant to a lock-up order served on plaintiff by defendant

21   Fowler.  (Dkt. No. 14 at 30.)  The lock-up order was prepared by defendant Lt. Kesterson, based

22   on her statements therein that she "was notified by CCK Jackura that he had inform[ed] Officer

23   San Nicholas that Inmate Johnson was currently housed at CSP-Solano.  I contacted Officer San

24
          [18]  Although plaintiff identified no other defendant by name in this administrative
25   grievance, defendants have made no challenge on this basis, presumably because  "exhaustion is
     not per se inadequate simply because an individual later sued was not named in the grievances."
26   Jones v. Bock, 549 U.S. 199, 219 (2007).

1   Nicholas at which time he stated that based on the 1997 battery he was request[ing] that Inmate

2   Johnson [be] placed in Administrative Segregation and transferred to an attentive level II

3   institution." (Dkt. No. 14 at 29.)  On May 22, 2007, plaintiff submitted another administrative

4   grievance challenging his placement in Ad Seg and requesting his return to the general prison

5   population, wherein he averred that he did not pose a threat to the safety and security of the

6   prison, and opined that the purported rationale for his Ad Seg placement, a "10 year old

7   incident," "has a scent of vindictiveness."[19]  (Dkt. No. 33-6 at 48 (Log. No. CSP-S-07-01570).)

8              Applying the analytical framework endorsed by the Ninth Circuit in Watison, 668

9   F.3d at 1115-17, and viewing the evidence in the light most favorable to plaintiff, the court finds

10  that plaintiff has presented sufficient evidence to defeat defendants' motion for summary

11  judgment on plaintiff's retaliation claim against defendants J. Johnson, Fowler, Jackura, San

12  Nicholas and Kesterson.  Specifically, plaintiff has submitted evidence demonstrating, or upon

13  which reasonable inferences may be drawn, that: (1) plaintiff engaged in an activity protected by

14  the First Amendment, viz., filing his February 14, 2007 administrative grievance challenging the

15  alleged events of February 11, 2007, particularly the alleged sexual harassment by defendant J.

16  Johnson;[20] (2) plaintiff was thereafter placed in Ad Seg pursuant to a lock-up order prepared by

17  defendant Kesterson, based on the reports of defendants Jackura and San Nicholas, and served on

18  plaintiff by defendant Fowler, who was defendant J. Johnson's supervisor; (3) the connection

19  between (1) and (2) may be inferred by:  (a) defendant J. Johnson's alleged intent to teach

20

21  _____

22      [19].  Although it appears that this administrative grievance was not administratively
    exhausted, defendants have made no challenge on this basis.  Failure to exhaust administrative

23  remedies is an affirmative defense that must be raised and proved by defendants.  Wyatt v.
    Terhune, 315 F.3d 1108, 1119 (9th Cir. 2003).

24      [20]  In addition, while not pursuant to the formal grievance process, plaintiff exercised his
    presumptive First Amendment right to civilly voice his concerns about the alleged events of

25  February 11, 2007, in letters written to the Internal Affairs Office (dated February 16, 2007), to
    "All Concerned Parties" (dated March 6, 2007), and to the Chief of Inmate Appeals (dated April

26  17, 2007).

plaintiff a lesson, and his enlistment of Fowler to assist in this objective;[21] (b) defendant Fowler's

alleged promise that he would send plaintiff to "the hole;"[22] and (c) the inconsistencies in the

evidence undermining each of the other defendants' purported lack of awareness of the 1997

incident between plaintiff and San Nicholas, supporting a reasonable inference that they each had

an ulterior motive in achieving plaintiff's Ad Seg placement;[23] (4) plaintiff's placement in Ad

Seg was a retaliatory action, constituting both a tangible harm, and conduct that would chill or

silence a person of ordinary firmness; and (5) the alleged absence of a legitimate penological

objective, specifically, that the asserted rationale for plaintiff's Ad Seg placement was pretextual.

It is plaintiff's theory, supported by reasonable inferences based on the available

evidence and viewed in the light most favorable to plaintiff, that defendants J. Johnson and

Fowler, motivated by retaliation against plaintiff for filing an administrative grievance

challenging the events of February 11, 2007, enlisted the cooperation of defendants Jackura, San

////

////

---

[21]   Although defendant J. Johnson allegedly first demonstrated retaliatory intent toward plaintiff prior to plaintiff filing the subject administrative grievance, it is reasonable to infer that J. Johnson's resolve was strengthened by plaintiff filing the grievance, in which he accused J. Johnson of sexually inappropriate conduct.  The alleged circumstances of the February 11, 2007 search are relevant to J. Johnson's state of mind days later.  Further evidence of J. Johnson's allegedly continuing hostility toward plaintiff includes his alleged intimidation of plaintiff and setting plaintiff up with false RVR's, after plaintiff's Ad Seg placement.

[22]   Although defendant Fowler allegedly first made this promise prior to plaintiff filing the subject administrative grievance, it is reasonable to infer that Fowler's resolve was strengthened by plaintiff filing the grievance.  As with J. Johnson, the alleged circumstances of the February 11, 2007 search are relevant to defendant Fowler's subsequent state of mind.  Further evidence of Fowler's allegedly continuing retaliatory intent toward plaintiff includes plaintiff's allegations that Fowler thereafter continued to intimidate plaintiff in the yard, and later allegedly acknowledged that he was still standing up for J. Johnson when he served the Ad Seg lock-up order on plaintiff.

[23]   Specifically, the apparent fact that Jackura signed off on plaintiff's January 9, 2007 "Initial Housing Review" intake form, which referenced plaintiff's prior "Battery on Staff at Solano;" San Nicholas's alleged interactions with plaintiff in January or February 2007, without incident; and Kesterson's alleged conversation with plaintiff about San Nicholas upon plaintiff's transfer to CSP-SOL, and her clearance of plaintiff to the yard.

1   Nicholas, and Kesterson to achieve plaintiff's placement in Ad Seg.[24]  Although it is not alleged

2   that defendants Jackura, San Nicholas and Kesterson were involved in the February 11, 2007

3   events, plaintiff contends that the evidence supports a reasonable inference that the asserted

4   reason for his Ad Seg placement was pretextual, and thus reasonably supports the further

5   inference that each of these defendants joined in retaliating against plaintiff.  The terse nature of

6   defendants' briefing in opposition underscores the conclusion that material factual disputes

7   underlie plaintiff's claim.  Defendants' conclusory statements that plaintiff's Ad Seg placement

8   "clearly advanced a legitimate correctional goal," and "clear[ly] . . . was not done for a retaliatory

9   purpose" (Dkt. No. 33-1 at 27-28), fall short; and at this point in the litigation plaintiff's theory is

10  equally plausible.[25]

11            For these reasons, defendants' motion for summary judgment should be denied on

12  plaintiff's claim that defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson

13  violated plaintiff's First Amendment right to file administrative grievances, by placing plaintiff

14  in Ad Seg in retaliation for his filing of an administrative grievance challenging the events of

15  February 11, 2007.

16            c.  Alleged Retaliation by Defendant Cervantes

17            The complaint also alleges that defendant Cervantes (CSP-SOL Inmate Appeals

18  Coordinator), acting in retaliation against plaintiff, "consistently screened out" plaintiff's prison

19  grievances, including "the grievance plaintiff filed on him for wrongly screening out his

20  grievances."[26]  (Cmplt., Dkt. No. 14 at 6-7, ¶ 14.)  In his opposition to the motion for summary

21

22      [24]  Plaintiff alleges that his Ad Seg placement also demonstrates that defendant Fowler
    "made good" on his February 11, 2007 threat to send plaintiff to the hole.  While this alleged
23  threat was made prior to plaintiff filing the relevant administrative grievance, evidence of the
    alleged threat may provide circumstantial evidence of Fowler's state of mind.

24      [25]  Plaintiff's companion conspiracy claim is discussed below.  (See n.28, infra, and
    related text.)
25

26      [26]  Specifically, the complaint alleges against defendant Cervantes:

judgment, plaintiff generally alleges that "Officer Cervantes perpetuated the retaliation [alleged against other defendants] by refusing to file Plaintiff's inmate appeal forms." (Dkt. No. 39 at 32.)

The court finds no evidence of record to support plaintiff's retaliation claim against defendant Cervantes. Cervantes' alleged failure to timely or properly process plaintiff's administrative grievances does not support a reasonable inference that Cervantes was motivated by retaliation against plaintiff for filing such grievances, or for challenging the conduct of other correctional officers. A Section 1983 claim will survive summary judgment only if plaintiff has presented sufficient evidence upon which to reasonably infer that there was an actual connection or link between the alleged actions of the defendant and the alleged deprivation suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, supra, 423 U.S. 362. As averred by defendant Cervantes in discovery (see Cervantes Ans. to Amd. Interr. Nos. 3-5), and supported by plaintiff's paper trail, it is reasonable to conclude that

---

On 2-12-07 Appeal Coordinator S. Cervantes refuse[d] to process plaintiff['s] grievance regarding the 2-11-07 incident, and request information he knew plaintiff did not have access to. Plaintiff explained on 2-23-07, and S. Cervantes still refuse[d] to process on 2-28-07, thus plaintiff forwarded the grievance with a complaint letter to the CDCR Appeals Branch on 3-6-07, and a follow-up letter on 4-17-07. (Cmplt., Dkt. No. 14 at 5, ¶ 6.)

On 5-22-07 plaintiff filed another grievance alleging the officers conspired in concert to place him in ad-seg as retaliation for him written (sic) the sexual harassment grievance, and the 1997 battery on staff. The grievance was logged CSP-S-07-01570, and denied on the first level. S. Cervantes refuse[d] to process the grievance for second level review even after Appeals headquarters requested it, and he still unjustly screened-out plaintiff['s] grievance, he stop[ped] the grievance completely from having a directors review. (Id. at 5-6, ¶ 10.)

While in ad-seg in June of 2007 the grievance filed on 2-14-07, and mailed on 3-6-07 to CDCR Appeals headquarters was returned. S. Cervantes finally four months later filed it log CSP-S-07-02026, the grievance was granted on the first level 8-22-07, and again on the second level 11-14-07. (Id. at 6, ¶ 13.)

1  Cervantes' allegedly delayed processing of plaintiff's February 14, 2007 administrative grievance

2  (Log No. CSP-S-07-02026), was due to plaintiff's failure to distinguish defendant J. Johnson

3  from the other two CSP-SOL correctional officers named "J. Johnson;" frustrated, plaintiff

4  improperly sought to bypass First Level Review, further delaying the processing of this

5  grievance.  Plaintiff cites no authority in support of his contention that "it was unreasonable to

6  place the burden of determining the full name of the Officer on Plaintiff, who did not have access

7  to that information" (Dkt. No. 39 at 33), and fails to demonstrate any relationship between this

8  conduct and Cervantes' allegedly retaliatory motive.

9          Plaintiff's further allegation that defendant Cervantes failed to process plaintiff's

10 grievance challenging his failure to receive a Religious Diet Card, despite completing a Religious

11 Diet Request (Pltf. Depo. at 27-28; Dkt. No. 39 at 32), fails for lack of any evidence in the record

12 to support plaintiff's assertion that he did in fact complete a Religious Diet Request.  Plaintiff has

13 not sought to develop, in opposition, any other retaliation claim against defendant Cervantes.

14         Plaintiff is informed that prisoners have no stand-alone due process rights related

15 to the administrative grievance process.  See Mann v. Adams, 855 F.2d 639, 640 (9th Cir.1988);

16 see also Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir.2003) (no liberty interest entitling

17 inmates to a specific grievance process).  Prison officials are not required under federal law to

18 process inmate grievances in a specific way or to respond to them in a favorable manner.

19 Plaintiff cannot state a cognizable claim for a violation of his due process rights based on

20 allegations that defendant Cervantes ignored or failed to properly process plaintiff's grievances.

21 See e.g. Wright v. Shannon, 2010 WL 445203 at *5 (E.D. Cal. 2010) (plaintiff's allegation that

22 prison officials denied or ignored his inmate appeals failed to state a cognizable First

23 Amendment claim); Walker v. Vazquez, 2009 WL 5088788, *6–7 (E.D. Cal. 2009) (plaintiff's

24 allegation that prison officials failed to timely process his inmate appeals failed to state a

25 cognizable Fourteenth Amendment claim); Williams v. Cate, 2009 WL 3789597, *6 (E.D. Cal.

26 2009) ("[p]laintiff has no protected liberty interest in the vindication of his administrative

1   claims").

2          For these reasons, defendants' motion for summary judgment on plaintiff's First

3   Amendment retaliation claim against defendant Cervantes should be granted.

4                  3.  Qualified Immunity

5          Defendants do not challenge clearly established law supporting a prisoner's First

6   Amendment right to right to file prison administrative grievances, Bruce v. Ylst, supra, 351 F.3d

7   at 1288, and First Amendment right to be free of official retaliation for exercising that right,

8   Rhodes v. Robinson, supra, 408 F.3d at 567-68.  Rather, defendants contend that they did not

9   retaliate against plaintiff for filing the subject administrative grievance.  However, the available

10  evidence, viewed in the light most favorable to plaintiff, supports an equally plausible inference

11  that defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson did retaliate against

12  plaintiff for filing the subject grievance, by placing plaintiff in Ad Seg pursuant to a pretextual

13  rationale.  Qualified immunity does not apply where the facts, construed in the light most

14  favorable to the party asserting the injury, show a violation of a clearly established constitutional

15  right.  Anderson v. Creighton, supra, 483 U.S. at 640.

16         Therefore, none of these five defendants -- J. Johnson, Fowler, Jackura, San

17  Nicholas, and Kesterson -- are entitled to qualified immunity on plaintiff's First Amendment

18  retaliation claim, premised on the filing of plaintiff's February 14, 2007 administrative

19  grievance.[27]

20                 4.  Summary of First Amendment Retaliation Claims

21         For the reasons stated above, the court should grant defendants' motion for

22  summary judgment on plaintiff's First Amendment retaliation claim against defendant Cervantes,

23

24   [27]  In contrast, based on the court's finding that the complaint fails to state a cognizable
First Amendment retaliation claim against: (1) defendants J. Johnson and Fowler, in response to
25  plaintiff's verbal statements to J. Johnson on February 11, 2007; and (2) defendant Cervantes, on
any ground; the court need not reach the question of qualified immunity.  Where the alleged facts
26  do not state a claim for violation of a constitutional right, the court need make no further inquiry
under a qualified immunity analysis.  Saucier v. Katz, supra, 533 U.S. at 201.

1  but deny defendants' motion for summary judgment on plaintiff's First Amendment retaliation

2  claims against defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson, premised on

3  the filing of plaintiff's relevant administrative grievance.

4      F.  Conspiracy Claim

5          Defendants do not address plaintiff's claim that defendants conspired to retaliate

6  against plaintiff, other than a passing reference in defendants' reply brief that "there is . . .

7  nothing but speculation that Cervantes was somehow involved in some conspiracy to retaliate

8  against the plaintiff."  (Dkt. No. 40 at 9.)  Plaintiff contends that defendants J. Johnson, Fowler,

9  Jackura, San Nicholas, and Kesterson, as well as defendant Cervantes, conspired to deprive

10 plaintiff of his constitutional rights, particularly to retaliate against plaintiff for his verbal

11 challenges to defendant J. Johnson, and plaintiff's subsequent filing of administrative grievances,

12 particularly his grievance against J. Johnson.[28]  With the exception of defendant Cervantes, for

13

14      [28]  In opposition to defendants' motion for summary judgment, plaintiff argues that,
    construing the facts in the light most favorable to plaintiff, it is reasonable to infer that
    defendants had a "meeting of the minds," and acted in concert, in the following ways  (Oppo.,
15  Dkt. No. 39 at 32-33 (citations to the record and case law omitted):

16      It is a reasonable inference from these facts that Officer Johnson left Plaintiff in
        the holding cage, discussed what had happened in the strip-out room with the
17      other officers, and together the officers agreed to retaliate against Plaintiff for his
        verbal complaints and challenges to Officer Johnson's sexual abuse.
18

19      Sergeant Fowler then told Plaintiff that he was going to make sure he went to the
        hole, that his parole would be denied, and that as long as he was on the yard, he
20      would be a bitch.  It is reasonable to infer that Sergeant Fowler enlisted other
        officers in further retaliation against Plaintiff consisted with his statement.
21      Plaintiff went to administrative segregation on April 26, 2007, based on
        Defendant's Jackura's report that San Nicholas was threatened by Plaintiff's
22      presence at CSP-Solano.  This occurred even though Kesterson had previously
        informed San Nicholas about Plaintiff's presence and San Nicholas had interacted
        with Plaintiff at least four times without San Nicholas feeling threatened.
23      Kesterson remembered getting clearance from San Nicholas when Plaintiff first
        arrived but after a discussion with Sergeant Fowler she told Plaintiff that she
24      couldn't help him.  Lieutenant Kesterson signed off on sending Plaintiff to
        Administrative Segregation.  Sergeant Fowler told Plaintiff he was going to "the
25      hole" because he had "kept his promises.

26      . . . Even though each participant in the conspiracy may not have not known the

whom the court finds no reasonable inference based on the available evidence to support plaintiff's conspiracy claim against him, the failure of defendants to substantively oppose plaintiff's conspiracy claim requires that their motion for summary judgment be denied on this claim as to defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson.

### 1. Legal Standards

A conspiracy claim brought under Section 1983 requires proof of "'an agreement or 'meeting of the minds' to violate constitutional rights," Franklin v. Fox, 312 F.3d 423, 441 (9th Cir. 2001), quoting United Steel Workers of Amer. v. Phelps Dodge Corp., 865 F.2d 1539,1540-41 (9th Cir.), cert. denied, 493 U.S. 809 (1989) (citation omitted), as well as an "'actual deprivation of constitutional rights resulting from the alleged conspiracy,'" Hart v. Parks, 450 F.3d 1059, 1071 (9th Cir. 2006), quoting Woodrum v. Woodward County, Okla., 866 F.2d 1121, 1126 (9th Cir. 1989) (citations omitted) . "'To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.'" Franklin, 312 F.3d at 441, quoting United Steel Workers, 865 F.2d at 1541.  A complaint must "allege specific facts to support the existence of a conspiracy among the defendants."  Buckey v. County of Los Angeles, 968, 791, 794 (9th Cir. 1992); Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 626 (9th Cir. 1988).  Plaintiff must allege that defendants conspired or acted jointly in concert and that some overt act was done in furtherance of the conspiracy.  Sykes v. State of California, 497 F.2d 197, 200 (9th Cir. 1974).

////

full extent of the retaliation that Plaintiff would incur, each knew that the objective was to retaliate against Plaintiff for his challenges to Officer Johnson's actions and later to the other officers putting him in administrative segregation.

. . . [Moreover,] the conspiracy to retaliate against Plaintiff resulted in actual retaliation that included threats, intimidation, and assaults by a group of officers on February 11, 2007; postponement of a parole hearing from June 2007, to June 2009; [and] 17 months in administrative segregation . . . ."

2. <u>Analysis</u>

Defendants' motion for summary judgment on plaintiff's conspiracy claim against defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson should be denied.  In addition to the failure of these defendants to substantively oppose plaintiff's conspiracy claim against them, the court finds sufficient evidence of record to support the reasonable inferences plaintiff identifies, specifically, that defendant J. Johnson and defendant Fowler agreed to verbally and physically intimidate plaintiff immediately after the challenged strip search; and that defendants J. Johnson and Fowler thereafter enlisted the cooperation of defendants Jackura, San Nicholas, and Kesterson to place plaintiff in Ad Seg in retaliation for plaintiff filing a formal grievance against J. Johnson and the events of February 11, 2007.  (<u>See</u> n.28, <u>supra</u>.)

In contrast, notwithstanding the failure of defendants to oppose plaintiff's conspiracy claim against defendants Cervantes, the court finds that the record is devoid of evidence to support a reasonable inference that Cervantes participated in a conspiracy to retaliate against plaintiff.

Similarly, while the court acknowledges plaintiff's deposition testimony that he named CSP-SOL Warden Sisto as a defendant in this action, based on plaintiff's belief that Sisto conspired with the other defendants to retaliate against plaintiff (Pltf. Depo. 72:13-75:23), the court finds no evidence of record to reasonably support this claim.  Plaintiff stated that he bases his belief on Sisto's June 8, 2007 letter to plaintiff, which plaintiff asserts was "outside" the normal appeal process, and demonstrated Sisto's awareness of plaintiff's allegations and decision not to intervene, thus ratifying the alleged conspiracy of the other defendants to retaliate against plaintiff.  (<u>Id.</u>; <u>see also</u> Dkt. No. 39-12 at 25 (plaintiff's responses to defendants' UF 92-97).)  However, Sisto's June 2007 letter was responsive to plaintiff's March 2007 letter, and thus did not address the fact of plaintiff's Ad Seg placement, or the allegedly retaliatory motives of the other defendants in securing such placement.  Consistently, defendant Sisto avers that he "has no recollection of ever learning prior to this litigation that the plaintiff had been placed into

1   administrative segregation for any reason. . . ." (Sisto Ans. to Amd. Interr. 10.)  The court finds

2   no evidence to support a reasonable inference that Sisto participated in the alleged conspiracy to

3   retaliate against plaintiff.

4           For these reasons, the court should grant defendants' motion for summary

5   judgment on plaintiff's conspiracy claim against defendants Cervantes and Sisto, but the court

6   should deny defendants' motion for summary judgment on plaintiff's conspiracy claim against

7   defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson.

8           3. Qualified Immunity

9           Based on the court's finding that the available evidence fails to support plaintiff's

10  conspiracy claims against defendants Cervantes and Sisto, the court need not reach defendants'

11  contention that they are entitled to qualified immunity on this claim.

12          Defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson, also seek

13  qualified immunity on plaintiff's conspiracy claim.  Defendants do not challenge clearly

14  established law supporting a prisoner's right to be free from a constitutional deprivation that is

15  the result of an official conspiracy to so deprive the prisoner of his constitutional rights.  See

16  Franklin v. Fox, supra, 312 F.3d at 441; Hart v. Parks, supra, 450 F.3d at 1071.  Rather, these

17  defendants aver that they reached no agreement to violate plaintiff's constitutional rights and,

18  moreover, that plaintiff was deprived of no constitutionally protected right.  For the most part,

19  defendants merely deny relevant factual recollections.  However, these matters remain material

20  factual disputes which, construed in plaintiff's favor, demonstrate a violation of clearly

21  established law proscribing official conspiracies to deprive a prisoner of his constitutional rights,

22  of which a reasonable correctional officer should be aware.  Because the court has found

23  sufficient evidence for this case to proceed to trial on plaintiff's underlying retaliation claims,

24  and found that the available facts, construed in plaintiff's favor, reasonably support an inference

25  that plaintiff's placement in Ad Seg was a retaliatory act achieved by the collusion of defendants

26  J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson, these defendants are not entitled to

1   qualified immunity on plaintiff's conspiracy claim.

2   VII.  Conclusion

3          For the foregoing reasons, IT IS HEREBY ORDERED that:

4          1.  The Clerk of Court shall randomly assign a district judge to this action; and

5          IT IS HEREBY RECOMMENDED that:

6          1.  Defendants Medinna, Abella, Fernandez, Ramirez and Fry should  be

7   dismissed from this action, pursuant to plaintiff's earlier decision to dismiss these defendants and

8   proceed on his Amended Complaint (see Dkt. Nos.17-19).

9          2.  Defendants' motion for summary judgment (Dkt. No. 33), should be granted in

10  part and denied in part.

11         3.  Summary judgment should be granted for defendants on plaintiff's Eighth

12  Amendment sexual harassment claim against defendant J. Johnson; on plaintiff's Eighth

13  Amendment excessive force claim against defendant Fowler; and on plaintiff's First

14  Amendment retaliation and conspiracy claims against defendants Sisto and Cervantes.

15         4.  This action should proceed on the following claims against the following

16  defendants:

17         a.  Against defendants Carroll and Sisto, on plaintiff's First Amendment free

18  exercise claims, and Fourteenth Amendment equal protection claims; and

19         b.  Against defendants J. Johnson, Fowler, Jackura, San Nicholas, and Kesterson

20  on plaintiff's First Amendment retaliation and conspiracy claims.

21         These findings and recommendations are submitted to the United States District

22  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 21 days

23  after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties.  Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

26  objections shall be filed and served within 14 days after service of the objections.  The parties are

1  advised that failure to file objections within the specified time may waive the right to appeal the

2  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3  DATED:  June 6, 2012

4

5                                                    KENDALL J. NEWMAN
                                                     UNITED STATES MAGISTRATE JUDGE

6

7  john1494.msj

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26